CLERKS OFFICE
US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED
4/7/2026

LAURA A. AUSTIN, CLERK
BY: s/J. Lopez
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**(Charlottesville Division)**

|  |  |
|---|---|
| )<br>)<br>)<br>IN RE SUBPOENA: )<br>THE BOARD OF VISITORS )<br>FOR THE UNIVERSITY OF VIRGINIA )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>_____ ) | Misc. Case No.: 3:26mc6 _____<br><br><br>In relation to<br>Eastern District of New York<br>Case No.: 25-cv-03939-BMC |

**PLAINTIFF EL-GHAZALY'S**
**DECLARATION IN SUPPORT OF**
**MOTION TO COMPEL**

I, Jon L. Norinsberg, affirm under the penalty of perjury that:

1.      I am counsel for Dr. Tarek El-Ghazaly, in the matter currently pending before the Eastern District of New York, bearing the caption Tarek El-Ghazaly, M.D. v. Jason Kim, M.D., et al., Civil Action No. 2:25-cv-03939 (BMC).

2.      On September 12, 2025, I filed the Amended Complaint in that matter, alleging in pertinent part that the Defendants, Dr. Jason Kim ("Defendant Kim"), Dr. Wayne Waltzer ("Defendant Waltzer"), Dr. John Fitzgerald ("Defendant Fitzgerald"), Ms. Lora Dempsey ("Defendant Dempsey"), and Dr. Zhenyue Huang ("Defendant Huang"), particularly Defendant Kim, directly made statements to UVA pertaining to Dr. El-Ghazaly that resulted in his candidacy being rescinded by UVA in reliance upon those statements.

3.      In the EDNY matter, I attempted to obtain the information pertaining to the statements made by Defendant Kim to UVA through deposition and written discovery but he

99973\328928518.v1

stonewalled every attempt made by Dr. El-Ghazaly to discovery those statements from him directly. Additionally, the candidate file possessed by Dr. El-Ghazaly contains no statement made by Dr. Kim to UVA, nor any of UVA's particular reasoning in UVA rescinding its fellowship offer to him beyond noting "board ineligibility." As the evidence currently possessed by Dr. El-Ghazaly is missing critical details that have been withheld from him by Dr. Kim and otherwise cannot be obtained through other means, Dr. El-Ghazaly was necessitated to file a subpoena *duces tecum* to UVA under Rule 45 of the Federal Rules of Civil Procedure.

4.      On February 13, 2026, with the assistance of our local counsel, John Nader of the national law firm of Hinshaw and Culbertson, LLP, who later had to be substituted with Megan Ben'Ary of the same firm. due to an unexpected leave of absence, we served Dr. El-Ghazaly's original subpoena duces tecum on UVA ("Subpoena"). Exhibit A to the Motion is a true and accurate copy of the Subpoena served on UVA. Exhibit B to the Motion is a true and accurate copy of the Proof of Service received Subpoena served on UVA.

5.      On February 24, 2025, I appeared with my co-counsel before the Eastern District of New York for discovery hearing related to the filing of the Subpoena among other discovery issues pending. In that hearing, Defendant Kim attempted to quash the Subpoena by moving to have it deemed improper. The presiding Judge disagreed with Defendant Kim, giving Dr. El-Ghazaly permission to seek the discovery he currently seeks from UVA. Exhibit C to the Motion is a true and accurate excerpt of the February 24, 2025 discovery hearing.

6.      With the assistance of local counsel, we engaged in correspondence with UVA, seeking to amicably resolve any issues posed by the Subpoena and at all times we have taken lengths to alleviate any potential prejudice UVA faced from complying with the Subpoena. We have repeatedly offered to pay reasonable fees and costs, reduced the production distance through

the place of production listed on the Subpoena, and have agreed to comply with University policies and procedures in order to receive the requested documents. My local counsel has tried to meet and confer in good faith to discuss this request with the UVA. We have also reissued the original Subpoena to attempt to remedy the objections raised by UVA.

7.    In response, we've only received a continued assertion of various objections with no indication that UVA would be willing to work with Dr. El-Ghazaly on his request. Exhibits D, E, F, G, H, and I are all true and correct copies of the documents constituting our efforts in working with UVA on Dr. El-Ghazaly's request.

8.    If permitted to compel production of the requested documents from UVA, Dr. El-Ghazaly, again, as he has done throughout these proceedings, offers to remedy the burden of production faced by UVA, through complying with UVA's polices and through covering reasonable fees and costs. He only requests the documents critical to his claims.

* * * *

Pursuant to 28 U.S.C. § 1746, I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

TAREK EL-GHAZALY, M.D.

By: _____

Name: _Jon Norinsberg_____

Date: _April 3, 2026_____

# Exhibit A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
-------------------------------------------------------x
In re Subpoena to:                                    :
                                                      :
THE BOARD OF VISITORS FOR                             :
THE UNIVERSITY OF VIRGINIA                            :
                                                      :
-------------------------------------------------------x

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

TO:    J. Scott Ballenger, Special Assistant to the President and Secretary of the Board of Visitors
       1826 University Avenue
       Charlottesville, Virginia 22903

*Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Please see Rider (Exhibit "A" hereto) for the requested documents.  The production being requested is in connection to an action pending in the United States District Court for the Eastern District of New York, Case Name: *Tarek El-Ghazaly, M.D. v. Jason Kim, M.D., et al.*, Civil Action No. 2:25-cv-03939 (BMC).

Place: Hinshaw & Culbertson, LLP c/o John A. Nader, Esq.        Date and Time:
4337 36th Street South, Arlington, Virginia 22206               2/27/2026 at 5:00 P.M.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: February 13, 2026            /s/ John A. Nader
                                   John Alexander Nader (VSB No. 73259)

The name, address, e-mail address, and telephone number of the attorney representing Tarek El-Ghazaly, M.D. is : Jarret Bodo, Esq.; 825 Third Ave., Suite 2100, New York, NY 10022; jarret@employeejustice.com; 212-227-5700; while the name, address, email address, and telephone number of the attorney issuing this subpoena is: John A. Nader, Esq. (VSB No. 73259); Hinshaw & Culbertson, LLP; 700 12th Street, Suite 700, Washington, D.C. 20005; (202)-979-5280; jnader@hinshawlaw.com

**Notice to the person who issues or requests this subpoena** If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT A**

**EXHIBIT A**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

TAREK EL-GHAZALY, M.D.,

Plaintiff,

  -against-

JASON KIM, M.D.,
WAYNE WALTZER, M.D.,
JOHN FITZGERALD, M.D.,
MS. LORA DEMPSEY, and
ZHENYUE HUANG, M.D.,

Defendants.

-----------------------------------------------------------------X

**RIDER TO RULE 45
SUBPOENA TO THE
BOARD OF VISITORS
FOR THE UNIVERSITY
OF VIRGINIA**

2:25-cv-03939 (BMC)

Pursuant to the Rule 45 subpoena issued on February 11, 2026, attached is the following rider:

<u>DOCUMENT REQUESTS</u>

1.    Any and all documents related to Tarek El-Ghazaly, M.D., including, but not limited to, the application form, curriculum vitae, personal statement, transcripts, test scores, communications, and all supporting materials submitted by or on behalf of Dr. El-Ghazaly to the University of Virginia School of Medicine.

Dated: New York, New York
       February 12, 2026

**JOSEPH & NORINSBERG, LLC**

By:_*Jarret Bodo*_____
      Jarret Bodo, Esq.
      *Attorneys for Plaintiff*
      825 Third Avenue, Suite 2100
      New York, NY
      Tel: (212) 227-5700

## STIPULATION RIDER OF TIMELY FILED SUBPOENA DUCES TECUM UNDER SCHEDULING ORDER

TAREK EL-GHAZALY, M.D.,

v.

JASON KIM, M.D., et al.,

Eastern District of New York Case No. 2:25-cv-03939 (BMC)

Pursuant to the Rule 45 subpoena issued on February 13, 2026, attached is the following stipulation rider:

I stipulate that this Rule 45 Subpoena was timely served on the Board of Visitors for the University of Virginia in accordance with the operative Scheduling Order for the above noted case. Due to becoming aware of the existence of relevant documents in the possession of the Board, I served this Subpoena through local counsel with a Return Date of February 27, 2026, to give the Board sufficient time to negotiate any production with me due to the narrow set of documents requested. This Subpoena is not being served to delay this matter's progress and any production made will be accomplished through negotiation with the Board to ensure any burden in producing is limited to only the most relevant information requested.

I can be contacted to discuss this request at (631) 942-5296 or jarret@employeejustice.com and I look forward to discussing it with your counsel.

Dated: February 13, 2026

**JOSEPH & NORINSBERG, LLC**

By: *Jarret Bodo*

Jarret Bodo, Esq. (N.Y. Admitted Only)
*Attorneys for Plaintiff*
825 Third Avenue, Suite 2100
New York, NY
Tel: (212) 227-5700

1

# Exhibit B

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* ___THE BOARD OF VISITORS FOR THE UNIVERSITY OF VIRGINIA___

on *(date)* February 13, 2026 .

☒ I served the subpoena by delivering a copy to the named individual as follows:

Debbie Rinker, Clerk of the Board, Office of the Board of Visitors, University of Virginia

_____ on *(date)* February 13, 2026 ; or

☐ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date:  February 13, 2026

*Deborah Bixler*

*Server's signature*

Deb Bixler, Private Process Server

*Printed name and title*

ARMENHYL GROUP LLC
929 2nd STREET SE
CHARLOTTESVILLE, VIRGINIA 22902

*Server's address*

Additional information regarding attempted service, etc.:

Documents delivered at 1646 Hours on February 13, 2026:

COVER LETTER TO THE UNIVERSITY OF VIRGINIA
Re:  El-Ghazaly v. Kim et al. - Docket No. 2:25-cv-03939 (BMC)
Rule 45 Subpoena for Production of Documents

SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION,
OR OBJECTS OR TO PERMIT INSPECTION
OF PREMISES IN A CIVIL ACTION

STIPULATION RIDER OF TIMELY FILED
SUBPOENA DUCES TECUM UNDER SCHEDULING ORDER



# Exhibit C

<u>**February 13, 2026 Hearing Transcript Excerpt**</u>

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

```
                                        :
TAREK EL-GHAZALY,                       : 25-CV-03939 (BMC)
                                        :
            Plaintiff,                  :
                                        :
                                        : United States Courthouse
    -against-                           : Brooklyn, New York
                                        :
                                        : February 24, 2025
                                        : 10:00 a.m.
JASON KIM, et al.,                      :
                                        :
            Defendants.                 :
                                        :
                                        :
```

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR CIVIL HEARING
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

```
For the Plaintiff:    JOSEPH & NORINSBERG, LLC
                      825 Third Avenue
                      New York, New York 10022
                      BY:  JON NORINSBERG, ESQ.
                      BY:  JARRET BODO, ESQ.
For the Defendant:    OFFICE OF NEW YORK STATE ATTORNEY
                      GENERAL
                      28 Liberty Street
                      New York, New York 10005
                      BY:  EVA LENORE DIETZ, ESQ.

Court Reporter:  Michele Lucchese, CRR, RPR
                 718-613-2272
                 e-mail:  MLuccheseEDNY@gmail.com
```

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

*MDL    RPR    CRR    CSR*
*Official Court Reporter*

Proceedings                                              2

THE COURTROOM DEPUTY:  Good morning.

Civil cause for civil hearing, 25-CV-03939,

El-Ghazaly versus Kim, et al.

Please state your appearance for the record,

starting with the plaintiff.

MR. NORINSBERG:  Jon Norinsberg on behalf of

plaintiff.  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BODO:  Jarret Bodo on behalf of plaintiff.

Good morning, Your Honor.

THE COURT:  Good morning.

MS. DIETZ:  Eva Dietz on behalf of the remaining

defendants, Drs. Kim and Waltzer.

Good morning, Your Honor.

THE COURT:  Good morning.

Let's start by going over the discovery disputes.

First, let me ask the plaintiff how did you not know

until nearly the end of discovery that your client was walking

around with a tape recorder?

MR. NORINSBERG:  Well, Your Honor, we had knew that

he had recordings.  But basically we asked him for the

recordings that we thought were relevant to the claims in the

case.  We should have asked more broadly about it, we should

have asked more broadly about it.  But we were aware.  It

wasn't like we just learned about that, but we did not know

Proceedings                                                        3

the full extent of it until this issue came to light.

THE COURT:  Okay.  Let me then ask the defendant a question, which is the discovery requests as you served them ceded the ground of relevance to plaintiff's determination. That is to say, as I understand it, and you will correct me if I am wrong, you asked him to produce all documents or recordings relevant to his termination.

Is that the way you phrased it?

MS. DIETZ:  It's possible, Your Honor.  I recently appeared because Mark Ferguson, this is his case, and he is out for medical reasons for the next two weeks, which is why I have appeared.  I do believe that might be how we phrased it. But we also issued interrogatories where we asked him to identify all of the recordings that he made, and he identified a fair number and then never produced those, and he said he had recorded them to make contemporaneous evidence.

THE COURT:  Did the interrogatories ask for the identification of all recordings or all recordings relevant to either the claims or particular events?  Did it use the word relevance?

MS. DIETZ:  Honestly, Your Honor, it might have.  I honestly can't remember.

I don't think we asked him to identify every recording he made.  But I -- so there might have been a limitation there.  I don't know if we used the word relevant

Proceedings                                                          4

or not.

But, regardless, he identified a number of recordings that he then never produced until we dug further in advance of his deposition and realized we hadn't received everything.

He said in those interrogatory responses that they were in his counsel's possession as of November of 2025.

THE COURT: Right. It doesn't matter because even if he had not erased them or deleted them, if, indeed, you only asked him to produce the ones that were relevant, he could have held those and not produced them to you because you asked him, if I am right, that you only asked for him to produce the relevant recordings. You asked him to determine relevance, and so he did.

Now, having determined the relevance, he deleted some that he thought were not relevant, but you allowed him to make that determination anyway. In other words, what I am saying is if you did, indeed, allow the determination of relevance to be made by the plaintiff, you cannot complain about deletions because you wouldn't have gotten them anyway.

MS. DIETZ: Understood, Your Honor. However, I will point out that one of the recordings that plaintiff belatedly produced in this document dump, he then introduced at a deposition a day later. So, clearly he thought that one was relevant but still had not produced that earlier.

Proceedings                                                                5

THE COURT:  Right.  But now you have got that one.

MS. DIETZ:  Yes, that's true.

THE COURT:  We have no basis -- again, I haven't seen your document requests or your interrogatories.  But if, indeed, it asked your adversary to make the determination of relevance, those are poorly drafted discovery requests.  That's not how you draft discovery requests.  Discovery requests have to say give me all of the recordings you made in the workplace while you were an employee, and then you make a determination of what's relevant.

MS. DIETZ:  Understood, Your Honor.

THE COURT:  Why don't we take a break here, and when I say a break, I'm just going to hold on, you look at your discovery requests and tell me what they ask for.

MS. DIETZ:  Okay.

THE COURT:  Because if there was one missing tape recording and you ultimately got it, this is no big deal, I'm certainly not going to award sanctions for that.

MS. DIETZ:  I'm at home right now and it is hard for me to pull up documents.  I do think it is possible that we said produce anything that's relevant to your termination.

I will also say, though, that he identified a lot of material and recordings that were then produced at the last minute and also that the case law says that we are not required to accept his explanation that he only deleted

Proceedings                                          6

relevant recordings, especially when he produced dead air recordings, recordings that are just sort of him walking around.  So he -- so the fact that he maintained those suggests that he selectively deleted recordings because admittedly he had produced recordings that are dead air.

THE COURT:  That's why you got a direct document request for interrogatory.  You are right.  He can't make a determination and the cases say so.

But I have now before me your interrogatory served on October 16th, and that says identify each audio or video recording you made which is relevant to the claims in or defenses to the Amended Complaint.  That is a very amateur-ish request.  It allowed the plaintiff to say I've given you everything or here's everything in response to that, it's what I think is relevant.  It's not what you think is relevant.  It's what I think is relevant.

And then your document request was all audio or video recordings or photographs relating to any allegation or claim in the Amended Complaint, and that allows him, not you and not me, to make the judgment of whether something is relating to an allegation or a claim in the Amended Complaint.

So, no, I'm not going to award sanctions because the requests were so bad that they don't warrant it.

Okay.  So that request is denied.

Now, let's go to the subpoenas.

Proceedings                                                7

First of all, Mr. Norinsberg, how many subpoenas have you got floating around out there.

MR. NORINSBERG:  There are only three subpoenas served.  And they are on very narrow issues.  One went to Harvard, one went to SUNY, and one went to the University of Virginia.  The Harvard and SUNYs were simply to obtain the letter of recommendation from Dr. Berg and whatever documents were kept on file relevant to that.  And the UVA one was simply to obtain whatever communications there were from Dr. Kim, which he acknowledged that he did have communications with UVA.  So there are very narrowly-tailored and there are only three of them out there, two of which have been responded to already.  The only outstanding one is UVA.

MS. DIETZ:  There is actually one more.  You may have forgotten that you also issued a document subpoena to Dr. Berg and that we found out about when Dr. Berg told us about it.

MR. NORINSBERG:  Right.  He appeared for a deposition and we waived -- once we had the letter of recommendation, we said no further compliance or subpoena was necessary.

MS. DIETZ:  It was two separate subpoenas.

MR. NORINSBERG:  To obtain the letter of recommendation, which once we obtained it, I spoke to general counsel at SUNY.  We withdraw the subpoenas because we had the

Proceedings                                                    8

document we were looking for.

And I would just add, Your Honor, we did -- literally, as soon as we got the records, within one day everything was produced.  Whatever we got was immediately produced.

MS. DIETZ:  Your Honor, that's not accurate.  A document was shown at a deposition that had not been produced to us.

MR. NORINSBERG:  That was the letter of recommendation.  It came in by subpoena the day before.  The very next day, everything was produced, everything that we had.

THE COURT:  Mr. Norinsberg, why were those subpoenas served so late in the process?

MR. NORINSBERG:  The candid answer is I myself directly got involved with this case about two weeks ago and I can get into more detail.  I did a very deep dive on the case and I realized this was a loose end that had not been covered by my team.

Now, to be fair, there was a subpoena that had already gone out on January 29th.  My role is simply identifying -- like honing in on this letter of recommendation that I thought was very important, but I got involved very late in the case.

At this point I'm handling everything going forward.

Proceedings                                                      9

That's really what happened, Judge.  Nothing more complex than that.  I realized it on deep review of the file.

THE COURT:  I appreciate the candor, but you understand that your firm can't avoid its responsibility by shifting attorneys on the case, right?

MR. NORINSBERG:  Most definitely, Judge.  It is embarrassing the way the discovery has been handled.  You've sanctioned us.  It was warranted.

We have made a lot of meaningful changes since that sanction.  We literally had to let one attorney go.  We hired a new dedicated litigation team that their whole job is to manage litigation properly.  This will never happen again.  Honestly, what you're seeing is the residual effects of a poorly managed case.  Our own responsibility at the end of the day, the buck stops here.  We did not take this lightly.  We made meaningful changes to make sure this will never happen again in a future case.

THE COURT:  The other thing I wanted to ask you is under Rule 45 you've got to give notice of the subpoena to your adversary and it doesn't look like that was done.  Even once you took over the case and you served these subpoenas, it looks like only coincidence allowed the defendant to understand that there were subpoenas floating around out there.  That's not the way Rule 45 is supposed to work.

MR. NORINSBERG:  It's definitely not, Your Honor.  I

Proceedings                                                      10

will say one subpoena on Harvard, there were discussions and

e-mails between counsel at our firm and Mr. Ferguson about

that.  The other two, that should have been done and was not

done.

          Normally, it's standard procedure, when I am working

with my regular process server, it is automatically copied to

defense counsel.  I don't even get involved.  It didn't

happen, Judge.  I mean, it should have been done and it was

not done.  It was not done.

          THE COURT:  Let me ask defense counsel, what's the

prejudice for you not having gotten the notice and for having

had these subpoenas served so late?

          MS. DIETZ:  Well, the prejudice is that, you know,

we had -- we put in our pre-motion.  Summary judgment is going

to be due at some point.  These documents are still out there.

They have identified four new people that we had no reason to

believe had any knowledge or information that was relevant to

this case.  Maybe we could have deposed them.  Maybe we could

have, you know, discovered what they know.  It's massive

prejudice to us because discovery is now over.  Summary

judgment -- our pre-motion letter is in.  Presumably summary

judgment is going to be scheduled.  There might be documents

that are going to continue to be produced and now there are

people who knows what they have to say, and we haven't had a

chance to test them.

Proceedings                                                11

THE COURT:  Mr. Norinsberg has just said that he is only got one document a piece from each one of these subpoenaed parties.  That's all you are likely to see.

As far as these witnesses, I'm not going to allow that.  It is too late in the process.  You want to go talk to them, you can talk to them.  That's fine.  But I'm not going to take their affidavits on summary judgment.  So I'm not seeing the prejudice.

MS. DIETZ:  Okay, Your Honor, I wasn't understanding that those outstanding subpoenas have all been responded to.

Is that what's happened?

I wasn't sure if UVA responded, because we haven't received documents in response to -- I think all of but one of the subpoenas.  I didn't understand documents have already been produced.  Is that the case?

MR. NORINSBERG:  We have exchanged the Harvard responses, which was more than one document.  But we've exchanged that.  The SUNY letter of recommendation from Dr. Berg, we have exchanged that.  The only one outstanding is UVA, which we have not received a response to.

THE COURT:  Look, if you get something from UVA and you're going to use it on summary judgment, then I might reopen discovery to allow a deposition of the person for UVA. But, Mr. Norinsberg, you're going to have to pay attorneys' fees to do that because it shouldn't be happening this way, as

Proceedings                                                      12

you acknowledge.  Let's see what you get from UVA.  I don't know.

So I'm not going to take any further action on the subpoenas at this time.  But I'm not going to allow any further depositions of -- I mean, Berg, you have agreed on.  Perry, PP Sale, Coretz or Greene, much too late in the process to start taking those depositions.

I think that's all of the discovery disputes that we have.

Now, let's talk about the summary judgment motion.  I will say to the defendants it seems to me that you have got a heavy oar to lift to get summary judgment on this.  You've got protected activity in March on retaliation claim and then you've got termination in April.  So at the least you have got temporal proximity.  But you've got a lot more than that.  You've got a good review from Dr. Berg just six weeks before the plaintiff was fired.

You've got a meeting between the plaintiff and Dr. Waltzer just three weeks before the plaintiff was fired and Dr. Waltzer didn't give a hint that there was anything was wrong.

You've got two weeks before plaintiff's termination a statement from Waltzer that he'd support plaintiff's transfer application to Harvard.

You've got the failure to follow the defendant's own

# Exhibit D

# HINSHAW

**HINSHAW & CULBERTSON LLP**
**Attorneys at Law**
700 12th Street NW,
Suite 700
Washington, DC, 20005
202-979-5282
212-935-1166 (fax)

www.hinshawlaw.com

Megan Ben'Ary
mbenary@hinshawlaw.com

Amy E. Hensley (via email)
Associate University Counsel
BOARD OF VISITORS FOR THE UNIVERSITY OF
VIRGINIA
aehensley@virginia.edu

Re:     **Response of Dr. Tarek El-Ghazaly to the University's February 26, 2026 Objections
in the matter of *In re Subpoena: The Board of Visitors for the University of Virginia***

Dear Ms. Hensley:

We have reviewed the Objections you served on February 26, 2026 to our pending *subpoena duces tecum* (the "SDT") to the Board of Visitors for the University of Virginia (the "University" or "UVA"). Below, please find Dr. El-Ghazaly's response to the Objections and an offer to cover the University's costs for compliance with the SDT in return for reaching an agreement for production to avoid additional legal costs for both sides.

## I.      Response to the University's Objections

In its Objections, the University asserts 1) that the SDT is invalid because it was not "issued from the Court where the matter is pending," Objection Ltr. at p. 1, and 2) that it is untimely under Judge Cogan's scheduling order. Id. at p. 2. Dr. El-Ghazaly contends that he received permission from Judge Cogan to seek these documents, and any perceived non-compliance with Rule 45(a)(2) would at most result in dismissal without prejudice, resulting in a refiling and unnecessary legal spend for both parties.

### A.      The SDT was timely served and issued and as its issuance was per Judge Cogan's explicit permission and without undue delay.

As noted, by the University's Objection, generally "a party may not rely upon the court's subpoena power to compel discovery from parties or non-parties after the discovery deadline." Livingston v. Copart of Conn., Inc., No. 3:17-cv-2543-JFA, 2020 U.S. Dist. LEXIS 248008, *17 (D.S.C. May 21, 2020) (quoting Harrison v. Kennedy, No. 3:18-cv-0057-RMG, 2019 U.S. Dist. LEXIS 132154, 2019 WL 3712187 (D.S.C. Aug. 7, 2019). But, under Rule 16 of the Federal Rules of Civil Procedure, a party may seek extension in modifying a scheduling order with a showing of "good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). But, where the subpoena is timely issued and served and the time for compliance occurs after the close of discovery, the subpoena may still be deemed enforceable with a show of good cause by the party seeking

**HINSHAW**

HINSHAW & CULBERTSON LLP
**Attorneys at Law**
700 12th Street NW,
Suite 700
Washington, DC, 20005
202-979-5282
212-935-1166 (fax)

www.hinshawlaw.com

Megan Ben'Ary
mbenary@hinshawlaw.com

discovery. See Wingster v. Lyons, No. 3:20-cv-1087, 2023 U.S. Dist. LEXIS 93490, \*5 (D. Conn. May 30, 2023) ("To satisfy the good cause standard, 'the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met." (quoting Sokol Holdings, Inc. v. BMB Munai, Inc., 2009 U.S. Dist. LEXIS 72659, 2009 WL 2524611, at \*7 (S.D.N.Y. Aug. 14, 2009)); see also Baburam v. Fed. Express Corp., 318 F.R.D. 5, 8 (E.D.N.Y. 2016) (characterizing the standard as requiring the moving party to show "that it was impossible to complete the discovery by the established deadline."). And good cause can be demonstrated by the party's diligence in seeking the discovery if the discovery deadline passes before the time for compliance. See Wingster, 2023 U.S. Dist. LEXIS 93490, at \*7 ("Because Defendant's counsel has demonstrated that he was diligent in continuing to seek [non-party's] deposition and to keep [opposing] counsel apprised of his efforts, Defendant . . . has distinguished himself from litigants who seek to compel depositions or discovery after the deadline without explanation for the delay or any showing of efforts to obtain the discovery prior to the deadline."); compare Agapito v. AHDS Bagel, LLC, No. 16-CV-8170 (JPO), 2018 U.S. Dist. LEXIS 83403, \*4 (S.D.N.Y. May 17, 2018) (denying a motion to compel as untimely where the moving party did not offer "any explanation" of why they were untimely in moving to compel), with Michael Grecco Photography, Inc. v. Everett Collection, Inc., No. 07-CV-8171(CM)(JCF), 2008 U.S. Dist. LEXIS 82426, \*6-7 (S.D.N.Y. Oct. 15, 2008), as corrected (Oct. 15, 2008) (holding that "repeated attempts" to schedule a deposition were sufficient to show diligence warranting relief even when counsel "made no effort to recruit the Court's assistance until after the discovery deadline had passed.").

Here, it is undisputed that the subpoena was served prior to the discovery deadline on February 13, 2026. Moreover, while that deadline has since passed, Dr. El-Ghazaly received express permission from Judge Cogan through an oral ruling to enforce the SDT per the attached transcript excerpt from a February 24, 2026 discovery hearing regarding the case's Rule 16 deadlines. There, the exact issue raised by the University was raised as an objection by Defendant's counsel to the issuance of the SDT. Defense counsel argued that discovery had closed and that enforcement of the SDT and other subpoenas would be prejudicial given the impending summary judgment schedule. (Tr. 9:18–25; 10:1–25). Judge Cogan, nevertheless, declined to quash the UVA subpoena or deem it improper under Rule 16. To the contrary, Judge Cogan expressly contemplated that Dr. El-Ghazaly could obtain the UVA records and potentially use them on summary judgment, particularly stating: "Look, *if you get something from UVA* and you're going to use it on summary judgment, then I might reopen discovery to allow a deposition of the person for UVA. But, Mr. Norinsberg, you're going to have to pay attorneys' fees to do that because it shouldn't be happening this way . . . *Let's see what you get from UVA.*" (Tr. 11:21–25; 12:1–4).



**HINSHAW & CULBERTSON LLP**
**Attorneys at Law**
700 12th Street NW,
Suite 700
Washington, DC, 20005
202-979-5282
212-935-1166 (fax)

**www.hinshawlaw.com**

Megan Ben'Ary
mbenary@hinshawlaw.com

He then added, "So I'm not going to take any further action on the subpoenas at this time," declining to rule on the Defendant's attempt to have the SDT deemed improper. (Tr. 12:1–2).

Thus, as Judge Cogan permitted the SDT to be issued and refused to deem the subpoena improper, its issuance was subject to his approval and was proper under Rule 45. And its issuance comes with conditions that must be complied with to alleviate any perceived prejudice.

### B.    Any Alleged Rule 45(a)(2) Defect is Purely Technical and Would Simply Result in Routine Re-Issuance of the Subpoena.

Further, were the Western District of Virginia to conclude that the SDT were not issued from the proper issuing court, this at most would result in the subpoena being refiled, causing negotiations surrounding its enforcement to become prolonged, increasing costs for both sides.

"[W]hen a subpoena-related motion has been filed in the wrong [d]istrict, courts routinely deny that motion without prejudice to [the movant] refiling it in the proper tribunal." Sacks Holdings, Inc. v. Grin Nat. USA Ltd., No. 1:23-cv-1058, 2024 U.S. Dist. LEXIS 131257, *7 (M.D.N.C. July 25, 2024) (quoting York Holding, 345 F.R.D. at 627). And counsel that mis-issued a subpoena may rectify that issue by "remed[ying] the defect in the subpoena at any point after its issuance." Doe I v. Walnuts, No. 5:08-M-000001, 2008 U.S. Dist. LEXIS 70986, *7 n.3 (W.D.Va. Sept. 19, 2008).

Here, as Dr. El-Ghazaly seeks documents from the University to oppose Defendant's Motion for Summary Judgment, he would refile the subpoena were it dismissed without prejudice per usual judicial practice or he would have it re-issued from the Eastern District of New York to remedy any possible issue. Thus, prolonging a conflict over a limited production would only serve to increase legal costs for both sides.

Further underscoring the futility of motion practice, it should be noted that Dr. El-Ghazaly is simultaneously pursuing a parallel action in New York State court in which the same University of Virginia records will inevitably be obtained through discovery in that proceeding. Accordingly, engaging in further motion practice over a purportedly technical Rule 45 issue—one that could be readily cured or rendered moot through the parallel state-court discovery process—would serve no practical purpose other than to multiply proceedings and increase costs. Resolving the matter now promotes judicial economy and avoids unnecessary satellite litigation over documents that will inevitably be produced in the ordinary course.



**HINSHAW & CULBERTSON LLP**
**Attorneys at Law**
700 12th Street NW,
Suite 700
Washington, DC, 20005
202-979-5282
212-935-1166 (fax)

**www.hinshawlaw.com**

Megan Ben'Ary
mbenary@hinshawlaw.com

## II.      Offer of Cooperation and Assistance in Return for Production

Consistent with Judge Cogan's oral ruling acknowledging that Dr. El-Ghazaly may obtain documents from UVA pursuant to the subpoena—"Let's see what you get from UVA…" (Tr. 12:1–4)—Dr. El-Ghazaly offers to cover any reasonable costs the University may incur in completing a production. He seeks only his residency candidate file and emails sent by Defendant Dr. Kim to the University. He does not seek to depose University employees or request a broader set of records. If agreeable, Dr. El-Ghazaly will reimburse the University for reasonable production costs and is willing to discuss appropriate redactions consistent with University policies.

Please contact me[1] at 202-979-5282 or mbenary@hinshawlaw.com or Jon Norinsburg at jon@norinsberglaw.com if this would be an agreeable solution to this issue.

Sincerely,

**HINSHAW & CULBERTSON LLP**

*/s/ Megan S. Ben'Ary*
Megan S. Ben'Ary

cc: Jon Norinsburg, Esq., jon@norinsberglaw.com

Jarret Bodo, Esq., jarret@employeejustice.com

Conley, Brandy, bc6gn@virginia.edu

Jacob D. Hopkins, Esq., jhopkins@hinshawlaw.com

---

[1]      Please note that John Nader has gone on medical leave since the subpoena was issued and served.

# Exhibit E

| From: | Hopkins, Jacob D. |
|---|---|
| To: | "hsc5te@virginia.edu" |
| Cc: | bc6gn@virginia.edu; Ben"Ary, Megan S.; Jon Norinsberg; Jarret Bodo |
| Subject: | Follow-up re: El-Ghazaly SDT - Board of Visitors of University of Virginia |
| Date: | Tuesday, March 17, 2026 12:44:21 PM |
| Attachments: | image005.png |
| | image006.png |
| | ElGhazalyUVAResponse Ltr..pdf |

Good afternoon, Ms. Hensley,

Ms. Sowers let me know that you wanted us to refer to the University's objection letter and follow up regarding Dr. El-Ghazaly's response. We provided a response to your letter on March 6, 2026, a copy of which is attached, giving more detail about the requested documents and the court's authorization to seek them. We are hopeful that this additional information will address your concerns and allow the University to produce the requested documents as soon as possible, as Dr. El-Ghazaly is currently facing the deadline to file his motion for summary judgment. If needed to comply with the University's policies, we're agreeable to re-issuing the subpoena out of the Eastern District of New York, and as previously noted, we will pay the reasonable cost of production in conjunction with this request.

To talk through the University's objections and Dr. El-Ghazaly's response to them, would you have availability for a short meet and confer phone call tomorrow? We are available from 9:30a.m. to 1:00p.m. and from 2:00p.m. to 3:00p.m. EST and can get something on the calendar if there is a time that works for you?

Have a good rest of your day,

Jacob

**Jacob Hopkins**
Associate
**Hinshaw & Culbertson LLP**
700 12th Street NW, Suite 700, Washington, DC 20005

**O:** 202-979-5276 | **F:** 212-935-1166
jhopkins@hinshawlaw.com
My Bio | hinshawlaw.com | in f X ⊡



Proudly
MANSFIELD RULE
CERTIFIED *PLUS*

# Exhibit F

| | |
|---|---|
| **From:** | Hensley, Amy E. (hsc5te) |
| **To:** | Ben"Ary, Megan S.; Hopkins, Jacob D. |
| **Cc:** | Conley, Brandy (bc6gn); Jon Norinsberg; Jarret Bodo; mark.ferguson@ag.ny.gov; eva.dietz@ag.ny.gov |
| **Subject:** | RE: Follow-up re: El-Ghazaly SDT - Board of Visitors of University of Virginia |
| **Date:** | Wednesday, March 18, 2026 4:41:39 PM |
| **Attachments:** | image007.png |
| | image012.png |
| | image013.png |
| | 20260226134032425.pdf |

**\*\*\*External email\*\*\***
This message came from outside your organization.

 Report Suspicious 

Good afternoon,

The University stands on its objections served on February 26, 2026. The objections are attached for your ease of reference.

Amy E. Hensley
Associate University Counsel

E aehensley@virginia.edu
P 434.924.3685

University of Virginia
Madison Hall
P.O. Box 400225
Charlottesville, VA 22904

universitycounsel.virginia.edu/



---

**From:** Ben'Ary, Megan S. <mbenary@hinshawlaw.com>
**Sent:** Wednesday, March 18, 2026 1:35 PM
**To:** Hopkins, Jacob D. <jhopkins@hinshawlaw.com>; Hensley, Amy E. (hsc5te) <hsc5te@virginia.edu>
**Cc:** Conley, Brandy (bc6gn) <bc6gn@virginia.edu>; Jon Norinsberg <jon@norinsberglaw.com>; Jarret Bodo <jarret@employeejustice.com>
**Subject:** RE: Follow-up re: El-Ghazaly SDT - Board of Visitors of University of Virginia

Good afternoon Ms. Hensley, following up on the email below, are you available this afternoon at 2 p.m. for a call to discuss this matter?  If not, can you please provide your availability for a call tomorrow?  Thanks.

**Megan S. Ben'Ary**
Partner

**Hinshaw & Culbertson LLP**
700 12th Street NW, Suite 700, Washington, DC 20005

**O:** 202-979-5282 | **F:** 212-935-1166
mbenary@hinshawlaw.com
My Bio | hinshawlaw.com | in f X ◎



| Proudly
**MANSFIELD RULE
CERTIFIED** *PLUS*

---

**From:** Hopkins, Jacob D. <jhopkins@hinshawlaw.com>
**Sent:** Tuesday, March 17, 2026 12:44 PM
**To:** hsc5te@virginia.edu
**Cc:** bc6gn@virginia.edu; Ben'Ary, Megan S. <mbenary@hinshawlaw.com>; Jon Norinsberg <jon@norinsberglaw.com>; Jarret Bodo <jarret@employeejustice.com>
**Subject:** Follow-up re: El-Ghazaly SDT - Board of Visitors of University of Virginia

Good afternoon, Ms. Hensley,

Ms. Sowers let me know that you wanted us to refer to the University's objection letter and follow up regarding Dr. El-Ghazaly's response. We provided a response to your letter on March 6, 2026, a copy of which is attached, giving more detail about the requested documents and the court's authorization to seek them. We are hopeful that this additional information will address your concerns and allow the University to produce the requested documents as soon as possible, as Dr. El-Ghazaly is currently facing the deadline to file his motion for summary judgment. If needed to comply with the University's policies, we're agreeable to re-issuing the subpoena out of the Eastern District of New York, and as previously noted, we will pay the reasonable cost of production in conjunction with this request.

To talk through the University's objections and Dr. El-Ghazaly's response to them, would you have availability for a short meet and confer phone call tomorrow? We are available from 9:30a.m. to 1:00p.m. and from 2:00p.m. to 3:00p.m. EST and can get something on the calendar if there is a time that works for you?

Have a good rest of your day,

Jacob

**Jacob Hopkins**
Associate
**Hinshaw & Culbertson LLP**

700 12th Street NW, Suite 700, Washington, DC 20005

**O:** 202-979-5276 | **F:** 212-935-1166
jhopkins@hinshawlaw.com
My Bio | hinshawlaw.com | in f X ◎



Hinshaw & Culbertson LLP is an Illinois registered limited liability partnership that has elected to be governed by the Illinois Uniform Partnership Act (1997).

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments.

# Exhibit G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------x

In re Subpoena to:                          :

                                            :

THE BOARD OF VISITORS FOR                   :
THE UNIVERSITY OF VIRGINIA                  :

                                            :

-------------------------------------x

**CORRECTED SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION,
OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL
ACTION**

TO:    J. Scott Ballenger, Special Assistant to the President and Secretary of the Board of Visitors
       1826 University Avenue
       Charlottesville, Virginia 22903

*Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below
the following documents, electronically stored information, or objects, and to permit inspection,
copying, testing, or sampling of the material: Please see Rider (Exhibit "B" hereto) for the
requested documents.  The production being requested is in connection to an action pending in the
United States District Court for the Eastern District of New York, Case Name: *Tarek El-Ghazaly,
M.D. v. Jason Kim, M.D., et al*., Civil Action No. 2:25-cv-03939 (BMC).

Place: University of Virginia, Records and Information          Date and Time:
Office 2400 Old Ivy Road Room 166 - Charlottesville, VA         3/27/2026 at 5:00 P.M.
22904

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule
45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to
respond to this subpoena and the potential consequences of not doing so.

Date: March 19, 2026          /s/ Jon L. Norinsberg
(Originally Issued            Jon L. Norinsberg, Esq (E.D.N.Y.
February 13, 2026)            Bar No. 2133)

The name, address, e-mail address, and telephone number of the attorney issuing the
subpoena for Tarek El-Ghazaly, M.D. is: Jon Norinsburg, Esq.; 825 Third Ave., Suite 2100,
New York, NY 10022; 212-791-5396, jon@norinsberglaw.com.

**Notice to the person who issues or requests this subpoena** If this subpoena commands the production of documents, electronically stored
information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this
case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4)

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❶ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❶ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT A**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X

TAREK EL-GHAZALY, M.D.,

Plaintiff,

  -against-

JASON KIM, M.D.,
WAYNE WALTZER, M.D.,
JOHN FITZGERALD, M.D.,
MS. LORA DEMPSEY, and
ZHENYUE HUANG, M.D.,

Defendants.

------------------------------------------------X

**RIDER TO RULE 45
SUBPOENA TO THE
BOARD OF VISITORS
FOR THE UNIVERSITY
OF VIRGINIA**

2:25-cv-03939 (BMC)

Pursuant to the Rule 45 subpoena issued on February 11, 2026, and reissued on the below noted date, attached is the following rider:

<u>DOCUMENT REQUESTS</u>

1.    Any and all documents related to Tarek El-Ghazaly, M.D., including, but not limited to, the application form, curriculum vitae, personal statement, transcripts, test scores, communications, and all supporting materials submitted by or on behalf of Dr. El-Ghazaly to the University of Virginia School of Medicine.

Dated: New York, New York
March 19, 2026

**JOSEPH & NORINSBERG, LLC**

By:    /s/ *Jon L. Norinsberg*
      Jon L. Norinsberg, Esq.
      *Attorneys for Plaintiff*
      825 Third Avenue, Suite 2100
      New York, NY
      Tel: (212) 791-5396

# Exhibit H



| Downtown Manhattan Office | Midtown Manhattan Office | Newark Office |
|---|---|---|
| One World Trade Center, 85th Floor | 825 Third Avenue, Suite 2100 | One Gateway Center, Suite 2600 |
| New York, New York 10007 | New York, New York 10022 | Newark, New Jersey 07102 |
| Philadelphia Office | Boston Office | Orlando Office |
| 1650 Market Street, Suite 3600 | 225 Franklin Street, 26th Floor | 300 N. New York Avenue, Suite 832 |
| Philadelphia, Pennsylvania 19103 | Boston, Massachusetts 02110 | Winter Park, Florida 32790 |

March 19, 2026

Amy E. Hensley (via email)
Associate University Counsel
BOARD OF VISITORS FOR THE UNIVERSITY OF
VIRGINIA
aehensley@virginia.edu

**Re:    Reissuance of February 13, 2026 Subpoena to Correct Clerical Error.**

Dear Ms. Hensley:

We have again reviewed the University's February 26, 2026 objections to Plaintiff's subpoena duces tecum (the "SDT") served on the Board of Visitors for the University of Virginia ("UVA").

As an initial matter, the SDT was timely served on February 13, 2026, prior to the close of discovery. (Exhibit A, original subpoena and proof of service).  While Defendants objected to this subpoena, the issue was addressed at the February 24, 2026 discovery hearing before Judge Cogan. Judge Cogan did not quash the subpoena or deem it improper. Instead, the Court expressly contemplated that UVA would furnish materials pursuant to the subpoena, stating: "Let's see what you get from UVA…" and further noting that if Plaintiff seeks to use any such materials on summary judgment, Plaintiff would be required to cover Defendants' reasonable costs. (Exhibit B, Feb. 24 Tr. at 11:21–23; 12:1–4).

To address the University's procedural objection under Rule 45(a)(2), we have reissued the subpoena from the Eastern District of New York. This correction is purely clerical and does not alter the substance or scope of the requests. The reissued subpoena is identical in all respects to the February 13, 2026 subpoena.

Importantly, UVA is not a target of this litigation in any respect. Plaintiff seeks only a narrow and discrete set of documents—specifically, his residency application file and communications from Defendant Dr. Kim to UVA. Plaintiff is not seeking any depositions, testimony, or broader discovery from the University. Consistent with the Court's guidance, Plaintiff remains willing to reimburse UVA for any reasonable costs associated with compliance and to confer regarding appropriate redactions consistent with University policies.

We are available to discuss this further and hope to resolve this without motion practice.

Please contact me at 212-791-5396 or jon@norinsberglaw.com to discuss this further and to avoid any motion practice associated with this request.

Sincerely,

**JOSEPH & NORINSBERG LLC**

Jon Norinsberg, Esq.
(E.D.NY. Bar No. 2133)

cc: Jarret Bodo, Esq., jarret@employeejustice.com

Megan S. Ben'Ary, Esq., mbenary@hinshawlaw.com

Jacob D. Hopkins, Esq., jhopkins@hinshawlaw.com

# Exhibit I

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
-------------------------------------------------------x
In re Subpoena to:                                   :
                                                     :
THE BOARD OF VISITORS FOR                            :
THE UNIVERSITY OF VIRGINIA                           :
                                                     :
-------------------------------------------------------x

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

TO:    J. Scott Ballenger, Special Assistant to the President and Secretary of the Board of Visitors
       1826 University Avenue
       Charlottesville, Virginia 22903

*Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Please see Rider (Exhibit "A" hereto) for the requested documents.  The production being requested is in connection to an action pending in the United States District Court for the Eastern District of New York, Case Name: *Tarek El-Ghazaly, M.D. v. Jason Kim, M.D., et al.*, Civil Action No. 2:25-cv-03939 (BMC).

Place: Hinshaw & Culbertson, LLP c/o John A. Nader, Esq.        Date and Time:
4337 36th Street South, Arlington, Virginia 22206              2/27/2026 at 5:00 P.M.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: February 13, 2026              /s/ John A. Nader_____
                                     John Alexander Nader (VSB No. 73259)

The name, address, e-mail address, and telephone number of the attorney representing Tarek El-Ghazaly, M.D. is : Jarret Bodo, Esq.; 825 Third Ave., Suite 2100, New York, NY 10022; jarret@employeejustice.com; 212-227-5700; while the name, address, email address, and telephone number of the attorney issuing this subpoena is: John A. Nader, Esq. (VSB No. 73259); Hinshaw & Culbertson, LLP; 700 12th Street, Suite 700, Washington, D.C. 20005; (202)-979-5280; jnader@hinshawlaw.com

---

**Notice to the person who issues or requests this subpoena** If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

&#9633;  I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

&#9633;  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $        0.00        .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
       **(i)** is a party or a party's officer; or
       **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
       **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
       **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

       **(i)** fails to allow a reasonable time to comply;
       **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
       **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
       **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

       **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
       **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
       **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
       **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
       **(i)** expressly make the claim; and
       **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT A**

Case 3:26-mc-00006-NKM-JCH     Document 2-1     Filed 04/07/26     Page 51 of 104
Pageid#: 66

**EXHIBIT A**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

TAREK EL-GHAZALY, M.D.,

Plaintiff,

  -against-

JASON KIM, M.D.,
WAYNE WALTZER, M.D.,
JOHN FITZGERALD, M.D.,
MS. LORA DEMPSEY, and
ZHENYUE HUANG, M.D.,

Defendants.

-----------------------------------------------------------------X

**RIDER TO RULE 45
SUBPOENA TO THE
BOARD OF VISITORS
FOR THE UNIVERSITY
OF VIRGINIA**

2:25-cv-03939 (BMC)

Pursuant to the Rule 45 subpoena issued on February 11, 2026, attached is the following

rider:

DOCUMENT REQUESTS

1.     Any and all documents related to Tarek El-Ghazaly, M.D., including, but not

limited to, the application form, curriculum vitae, personal statement, transcripts, test scores,

communications, and all supporting materials submitted by or on behalf of Dr. El-Ghazaly to the

University of Virginia School of Medicine.

Dated: New York, New York
       February 12, 2026

**JOSEPH & NORINSBERG, LLC**

By:_*Jarret Bodo*_____
      Jarret Bodo, Esq.
      *Attorneys for Plaintiff*
      825 Third Avenue, Suite 2100
      New York, NY
      Tel: (212) 227-5700

# Exhibit B

# February 13, 2026 Hearing Transcript Excerpt

1

                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                          :
TAREK EL-GHAZALY,                         : 25-CV-03939 (BMC)
                                          :
            Plaintiff,                    :
                                          :
                                          : United States Courthouse
     -against-                            : Brooklyn, New York
                                          :
                                          : February 24, 2025
                                          : 10:00 a.m.
JASON KIM, et al.,                        :
                                          :
            Defendants.                   :
                                          :
                                          :
                                          :

- - - - - - - - - - - - - - - X

          TRANSCRIPT OF CIVIL CAUSE FOR CIVIL HEARING
             BEFORE THE HONORABLE BRIAN M. COGAN
             UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Plaintiff:    JOSEPH & NORINSBERG, LLC
                      825 Third Avenue
                      New York, New York 10022
                      BY:  JON NORINSBERG, ESQ.
                      BY:  JARRET BODO, ESQ.
For the Defendant:    OFFICE OF NEW YORK STATE ATTORNEY
                      GENERAL
                      28 Liberty Street
                      New York, New York 10005
                      BY:  EVA LENORE DIETZ, ESQ.

Court Reporter:  Michele Lucchese, CRR, RPR
                 718-613-2272
                 e-mail:  MLuccheseEDNY@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Proceedings                                                        2

THE COURTROOM DEPUTY:  Good morning.

Civil cause for civil hearing, 25-CV-03939,

El-Ghazaly versus Kim, et al.

Please state your appearance for the record,

starting with the plaintiff.

MR. NORINSBERG:  Jon Norinsberg on behalf of

plaintiff.  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BODO:  Jarret Bodo on behalf of plaintiff.

Good morning, Your Honor.

THE COURT:  Good morning.

MS. DIETZ:  Eva Dietz on behalf of the remaining

defendants, Drs. Kim and Waltzer.

Good morning, Your Honor.

THE COURT:  Good morning.

Let's start by going over the discovery disputes.

First, let me ask the plaintiff how did you not know

until nearly the end of discovery that your client was walking

around with a tape recorder?

MR. NORINSBERG:  Well, Your Honor, we had knew that

he had recordings.  But basically we asked him for the

recordings that we thought were relevant to the claims in the

case.  We should have asked more broadly about it, we should

have asked more broadly about it.  But we were aware.  It

wasn't like we just learned about that, but we did not know

Proceedings                                                          3

the full extent of it until this issue came to light.

THE COURT:  Okay.  Let me then ask the defendant a question, which is the discovery requests as you served them ceded the ground of relevance to plaintiff's determination. That is to say, as I understand it, and you will correct me if I am wrong, you asked him to produce all documents or recordings relevant to his termination.

Is that the way you phrased it?

MS. DIETZ:  It's possible, Your Honor.  I recently appeared because Mark Ferguson, this is his case, and he is out for medical reasons for the next two weeks, which is why I have appeared.  I do believe that might be how we phrased it. But we also issued interrogatories where we asked him to identify all of the recordings that he made, and he identified a fair number and then never produced those, and he said he had recorded them to make contemporaneous evidence.

THE COURT:  Did the interrogatories ask for the identification of all recordings or all recordings relevant to either the claims or particular events?  Did it use the word relevance?

MS. DIETZ:  Honestly, Your Honor, it might have.  I honestly can't remember.

I don't think we asked him to identify every recording he made.  But I -- so there might have been a limitation there.  I don't know if we used the word relevant

Proceedings                                                    4

or not.

But, regardless, he identified a number of recordings that he then never produced until we dug further in advance of his deposition and realized we hadn't received everything.

He said in those interrogatory responses that they were in his counsel's possession as of November of 2025.

THE COURT:  Right.  It doesn't matter because even if he had not erased them or deleted them, if, indeed, you only asked him to produce the ones that were relevant, he could have held those and not produced them to you because you asked him, if I am right, that you only asked for him to produce the relevant recordings.  You asked him to determine relevance, and so he did.

Now, having determined the relevance, he deleted some that he thought were not relevant, but you allowed him to make that determination anyway.  In other words, what I am saying is if you did, indeed, allow the determination of relevance to be made by the plaintiff, you cannot complain about deletions because you wouldn't have gotten them anyway.

MS. DIETZ:  Understood, Your Honor.  However, I will point out that one of the recordings that plaintiff belatedly produced in this document dump, he then introduced at a deposition a day later.  So, clearly he thought that one was relevant but still had not produced that earlier.

Proceedings                                                    5

THE COURT:  Right.  But now you have got that one.

MS. DIETZ:  Yes, that's true.

THE COURT:  We have no basis -- again, I haven't seen your document requests or your interrogatories.  But if, indeed, it asked your adversary to make the determination of relevance, those are poorly drafted discovery requests.  That's not how you draft discovery requests.  Discovery requests have to say give me all of the recordings you made in the workplace while you were an employee, and then you make a determination of what's relevant.

MS. DIETZ:  Understood, Your Honor.

THE COURT:  Why don't we take a break here, and when I say a break, I'm just going to hold on, you look at your discovery requests and tell me what they ask for.

MS. DIETZ:  Okay.

THE COURT:  Because if there was one missing tape recording and you ultimately got it, this is no big deal, I'm certainly not going to award sanctions for that.

MS. DIETZ:  I'm at home right now and it is hard for me to pull up documents.  I do think it is possible that we said produce anything that's relevant to your termination.

I will also say, though, that he identified a lot of material and recordings that were then produced at the last minute and also that the case law says that we are not required to accept his explanation that he only deleted

Proceedings                                                                6

relevant recordings, especially when he produced dead air

recordings, recordings that are just sort of him walking

around.  So he -- so the fact that he maintained those

suggests that he selectively deleted recordings because

admittedly he had produced recordings that are dead air.

THE COURT:  That's why you got a direct document

request for interrogatory.  You are right.  He can't make a

determination and the cases say so.

But I have now before me your interrogatory served

on October 16th, and that says identify each audio or video

recording you made which is relevant to the claims in or

defenses to the Amended Complaint.  That is a very amateur-ish

request.  It allowed the plaintiff to say I've given you

everything or here's everything in response to that, it's what

I think is relevant.  It's not what you think is relevant.

It's what I think is relevant.

And then your document request was all audio or

video recordings or photographs relating to any allegation or

claim in the Amended Complaint, and that allows him, not you

and not me, to make the judgment of whether something is

relating to an allegation or a claim in the Amended Complaint.

So, no, I'm not going to award sanctions because the

requests were so bad that they don't warrant it.

Okay.  So that request is denied.

Now, let's go to the subpoenas.

Proceedings                                          7

First of all, Mr. Norinsberg, how many subpoenas have you got floating around out there.

MR. NORINSBERG:  There are only three subpoenas served.  And they are on very narrow issues.  One went to Harvard, one went to SUNY, and one went to the University of Virginia.  The Harvard and SUNYs were simply to obtain the letter of recommendation from Dr. Berg and whatever documents were kept on file relevant to that.  And the UVA one was simply to obtain whatever communications there were from Dr. Kim, which he acknowledged that he did have communications with UVA.  So there are very narrowly-tailored and there are only three of them out there, two of which have been responded to already.  The only outstanding one is UVA.

MS. DIETZ:  There is actually one more.  You may have forgotten that you also issued a document subpoena to Dr. Berg and that we found out about when Dr. Berg told us about it.

MR. NORINSBERG:  Right.  He appeared for a deposition and we waived -- once we had the letter of recommendation, we said no further compliance or subpoena was necessary.

MS. DIETZ:  It was two separate subpoenas.

MR. NORINSBERG:  To obtain the letter of recommendation, which once we obtained it, I spoke to general counsel at SUNY.  We withdraw the subpoenas because we had the

Proceedings                                                          8

document we were looking for.

And I would just add, Your Honor, we did -- literally, as soon as we got the records, within one day everything was produced.  Whatever we got was immediately produced.

MS. DIETZ:  Your Honor, that's not accurate.  A document was shown at a deposition that had not been produced to us.

MR. NORINSBERG:  That was the letter of recommendation.  It came in by subpoena the day before.  The very next day, everything was produced, everything that we had.

THE COURT:  Mr. Norinsberg, why were those subpoenas served so late in the process?

MR. NORINSBERG:  The candid answer is I myself directly got involved with this case about two weeks ago and I can get into more detail.  I did a very deep dive on the case and I realized this was a loose end that had not been covered by my team.

Now, to be fair, there was a subpoena that had already gone out on January 29th.  My role is simply identifying -- like honing in on this letter of recommendation that I thought was very important, but I got involved very late in the case.

At this point I'm handling everything going forward.

Proceedings                                                    9

That's really what happened, Judge.  Nothing more complex than that.  I realized it on deep review of the file.

THE COURT:  I appreciate the candor, but you understand that your firm can't avoid its responsibility by shifting attorneys on the case, right?

MR. NORINSBERG:  Most definitely, Judge.  It is embarrassing the way the discovery has been handled.  You've sanctioned us.  It was warranted.

We have made a lot of meaningful changes since that sanction.  We literally had to let one attorney go.  We hired a new dedicated litigation team that their whole job is to manage litigation properly.  This will never happen again.  Honestly, what you're seeing is the residual effects of a poorly managed case.  Our own responsibility at the end of the day, the buck stops here.  We did not take this lightly.  We made meaningful changes to make sure this will never happen again in a future case.

THE COURT:  The other thing I wanted to ask you is under Rule 45 you've got to give notice of the subpoena to your adversary and it doesn't look like that was done.  Even once you took over the case and you served these subpoenas, it looks like only coincidence allowed the defendant to understand that there were subpoenas floating around out there.  That's not the way Rule 45 is supposed to work.

MR. NORINSBERG:  It's definitely not, Your Honor.  I

Proceedings                                          10

will say one subpoena on Harvard, there were discussions and e-mails between counsel at our firm and Mr. Ferguson about that.  The other two, that should have been done and was not done.

Normally, it's standard procedure, when I am working with my regular process server, it is automatically copied to defense counsel.  I don't even get involved.  It didn't happen, Judge.  I mean, it should have been done and it was not done.  It was not done.

THE COURT:  Let me ask defense counsel, what's the prejudice for you not having gotten the notice and for having had these subpoenas served so late?

MS. DIETZ:  Well, the prejudice is that, you know, we had -- we put in our pre-motion.  Summary judgment is going to be due at some point.  These documents are still out there. They have identified four new people that we had no reason to believe had any knowledge or information that was relevant to this case.  Maybe we could have deposed them.  Maybe we could have, you know, discovered what they know.  It's massive prejudice to us because discovery is now over.  Summary judgment -- our pre-motion letter is in.  Presumably summary judgment is going to be scheduled.  There might be documents that are going to continue to be produced and now there are people who knows what they have to say, and we haven't had a chance to test them.

Proceedings                                                11

THE COURT:  Mr. Norinsberg has just said that he is only got one document a piece from each one of these subpoenaed parties.  That's all you are likely to see.

As far as these witnesses, I'm not going to allow that.  It is too late in the process.  You want to go talk to them, you can talk to them.  That's fine.  But I'm not going to take their affidavits on summary judgment.  So I'm not seeing the prejudice.

MS. DIETZ:  Okay, Your Honor, I wasn't understanding that those outstanding subpoenas have all been responded to.

Is that what's happened?

I wasn't sure if UVA responded, because we haven't received documents in response to -- I think all of but one of the subpoenas.  I didn't understand documents have already been produced.  Is that the case?

MR. NORINSBERG:  We have exchanged the Harvard responses, which was more than one document.  But we've exchanged that.  The SUNY letter of recommendation from Dr. Berg, we have exchanged that.  The only one outstanding is UVA, which we have not received a response to.

THE COURT:  Look, if you get something from UVA and you're going to use it on summary judgment, then I might reopen discovery to allow a deposition of the person for UVA. But, Mr. Norinsberg, you're going to have to pay attorneys' fees to do that because it shouldn't be happening this way, as

Proceedings                                                           12

you acknowledge.  Let's see what you get from UVA.  I don't know.

So I'm not going to take any further action on the subpoenas at this time.  But I'm not going to allow any further depositions of -- I mean, Berg, you have agreed on. Perry, PP Sale, Coretz or Greene, much too late in the process to start taking those depositions.

I think that's all of the discovery disputes that we have.

Now, let's talk about the summary judgment motion. I will say to the defendants it seems to me that you have got a heavy oar to lift to get summary judgment on this.  You've got protected activity in March on retaliation claim and then you've got termination in April.  So at the least you have got temporal proximity.  But you've got a lot more than that. You've got a good review from Dr. Berg just six weeks before the plaintiff was fired.

You've got a meeting between the plaintiff and Dr. Waltzer just three weeks before the plaintiff was fired and Dr. Waltzer didn't give a hint that there was anything was wrong.

You've got two weeks before plaintiff's termination a statement from Waltzer that he'd support plaintiff's transfer application to Harvard.

You've got the failure to follow the defendant's own

# Exhibit I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re Subpoena to:                              :
                                                :
THE BOARD OF VISITORS FOR                       :
THE UNIVERSITY OF VIRGINIA                       :
                                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## CORRECTED SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

TO:    J. Scott Ballenger, Special Assistant to the President and Secretary of the Board of Visitors
       1826 University Avenue
       Charlottesville, Virginia 22903

*Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Please see Rider (Exhibit "B" hereto) for the requested documents. The production being requested is in connection to an action pending in the United States District Court for the Eastern District of New York, Case Name: *Tarek El-Ghazaly, M.D. v. Jason Kim, M.D., et al.*, Civil Action No. 2:25-cv-03939 (BMC).

| | |
|---|---|
| Place: University of Virginia, Records and Information Office 2400 Old Ivy Road Room 166 - Charlottesville, VA 22904 | Date and Time: <u>3/27/2026 at 5:00 P.M.</u> |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: <u>March 19, 2026</u>          /s/ Jon L. Norinsberg
(Originally Issued            Jon L. Norinsberg, Esq (E.D.N.Y.
<u>February 13, 2026)</u>          Bar No. 2133)

The name, address, e-mail address, and telephone number of the attorney issuing the subpoena for <u>Tarek El-Ghazaly, M.D.</u> is: <u>Jon Norinsburg, Esq.; 825 Third Ave., Suite 2100, New York, NY 10022; 212-791-5396, jon@norinsberglaw.com.</u>

**Notice to the person who issues or requests this subpoena** If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4)

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

                                                                    J. Scott Ballenger,
                                                                    Special Asst. to the President & Secretary of the Board of Visitors
I received this subpoena for *(name of individual and title, if any)* _____

on *(date)*   March 20, 2026    .

    ◊ I served the subpoena by delivering a copy to the named individual as follows:

      **By serving Debra Rinker, Clerk of the Board of Visitors at 1826 University Ave..Charlottesville, VA at 1:07 p.m.**

                                                            on *(date)*   March 20, 2026    ; or

    ◊ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

    $ _____    .

My fees are $ _____    for travel and $ _____    for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:    3/25/26

                                    _____
                                                    *Server's signature*

                                    R. Wayne Tonker, Process Server
                                                *Printed name and title*

                                    268  Turkeysag Trail, Suite 102, #154
                                    Palmyra, Virginia 22963
                                    434-589-4779
                                                *Server's address*

Additional information regarding attempted service, etc.:

**Additional Documents Attached:  Exhibits**

# Exhibit J

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

TAREK EL-GHAZALY, M.D.,

                              Plaintiff,                    Case No.: 25-cv-3939

    -against-                                **FIRST AMENDED
COMPLAINT**

JASON KIM, M.D., WAYNE WALTZER, M.D.,
JOHN FITZGERALD, M.D., MS. LORA
DEMPSEY, and ZHENYUE HUANG, M.D.,         **JURY TRIAL
DEMANDED**

                             Defendants.

-----------------------------------------------------------------X

        Plaintiff Tarek El-Ghazaly, M.D., ("Plaintiff" or "Dr. El-Ghazaly"), as and for his First
Amended Complaint against Defendants Dr. Jason Kim, Dr. Wayne Waltzer, Dr. John Fitzgerald,
Ms. Lora Dempsey, and Dr. Zhenyue Huang (collectively, "Defendants"), alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

        1.      This case is about a medical institution that abandoned its sacred duty to protect
human life and instead cultivated a culture of hubris, bigotry, and retribution. At Stony Brook
University Hospital ("SBUH" or the "Hospital"), physicians sworn to do no harm weaponized their
authority to humiliate, silence and ultimately expel a young Egyptian doctor who dared to speak
the truth.

        2.      Dr. Tarek El-Ghazaly was not only a highly competent and dedicated resident—he
was a whistleblower who risked his career to protect patients from negligent care, unqualified
supervision, and racially charged abuse masquerading as medical leadership.

        3.      Rather than address the dangerous misconduct he exposed, SBUH's leadership
doubled down on retaliation. At the heart of this case lies a disturbing truth: the very individuals

entrusted with training the next generation of doctors—Defendants Jason Kim, M.D., Wayne Waltzer, M.D., and John Fitzgerald, M.D. — brazenly violated the Hippocratic Oath. They permitted, perpetuated, and participated in a system where racism was tolerated, medical incompetence was concealed, and physical assault in the operating room went unpunished.

4.      Dr. El-Ghazaly's courage in documenting patient safety risks, exposing hate speech from his supervisors, and reporting violent misconduct should have earned him praise. Instead, it made him a target. SBUH and its senior physicians, including Defendants herein, responded not with reform, but with calculated lies, gaslighting, and, ultimately, termination—all to protect their reputations and silence dissent.

5.      This lawsuit seeks to hold Defendants accountable for the institutional cowardice and moral decay that permanently and irreparably destroyed Dr. El-Ghazaly's medical career. Plaintiff brings federal claims under 42 U.S.C. § 1983 (enforcing rights secured by the Equal Protection Clause and 42 U.S.C. § 1981) and state claims under the New York State Human Rights Law. Plaintiff seeks damages against Defendants Kim, Waltzer, Fitzgerald, Dempsey, and Huang in their individual capacities for violations of federal and state law.

## JURY TRIAL DEMANDED

6.      Plaintiff demands a jury trial on all claims alleged herein.

## PARTIES

7.      TAREK EL-GHAZALY, M.D. is an Egyptian and Canadian national, resident of Qatar, and at all relevant times was a PGY-3 Urology resident at Stony Brook University Hospital ("SBUH").

8.      JASON KIM, M.D. was Program Director of the Urology Residency and acted under color of state law; sued individually for damages.

2

9.      WAYNE WALTZER, M.D. was Chair of Urology and acted under color of state law; sued individually for damages.

10.     JOHN FITZGERALD, M.D. was a Urology attending and acted under color of state law; sued individually for damages.

11.     LORA DEMPSEY was a Program Coordinator in Urology/GME and acted under color of state law; sued individually for damages.

12.     ZHENYUE HUANG, M.D. was a senior resident/fellow and acted under color of state law; sued individually for damages.

## JURISDICTION AND VENUE

13.     This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiff has brought federal claims, including claims for discrimination under 42 U.S.C. § 1983. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3)–(4).

14.     The Court may exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over Dr. Jason Kim because Defendant has violated Plaintiff's rights in this district and a substantial part of the events that gave rise to this Complaint occurred in this district.

16.     This Court has personal jurisdiction over Dr. Wayne Waltzer because Defendant has violated Plaintiff's rights in this district and a substantial part of the events that gave rise to this Complaint occurred in this district.

17.     This Court has personal jurisdiction over Dr. John Fitzgerald because Defendant has violated Plaintiff's rights in this district and a substantial part of the events that gave rise to this Complaint occurred in this district.

18.     This Court has personal jurisdiction over Ms. Lora Dempsey because Defendant has violated Plaintiff's rights in this district and a substantial part of the events that gave rise to this Complaint occurred in this district.

19.     This Court has personal jurisdiction over Dr. Zhenyue Huang because Defendant has violated Plaintiff's rights in this district and a substantial part of the events that gave rise to this Complaint occurred in this district.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as one or more Defendants reside within the Eastern District of New York and the acts complained of occurred therein.

## FACTUAL ALLEGATIONS

### *Background and Hiring*

21.     Dr. Tarek El-Ghazaly is a highly talented and dedicated Egyptian physician who earned his medical degree and was completing rigorous, advanced training in urology in the United States.

22.     On November 1, 2022, Dr. El-Ghazaly was recruited and hired by SBUH as an off-cycle PGY-2 Urology resident, having left a prestigious clinical robotic and laparoscopic surgery fellowship position at Northwestern University in Chicago.

23.     From day one, Dr. El-Ghazaly was placed under the authority of Defendants Kim (Program Director), Waltzer (Chair), and Fitzgerald (Attending)—all of whom exercised direct

4

and unfettered control over Plaintiff's daily duties, performance evaluations, work assignments, training, and ultimately his future in the program.

24. These same Defendants also wielded authority over pay, personnel records, and critical decisions about retention, discipline, and termination.

25. Egyptian ancestry is a race/ethnicity protected by § 1981.

26. Dr. El-Ghazaly was indisputably qualified and consistently performed above expectations, as evidenced by glowing feedback from multiple attending physicians.

### *Racism, Dehumanization, and a Culture of Intolerance*

27. From the outset, Dr. El-Ghazaly was subjected to a relentless pattern of racist, degrading, and dehumanizing comments and treatment.

28. In March 2023, during his rotation at the Northport VA Medical Center, Dr. Fitzgerald, while seeing patients in the clinic, sneered at him and said, "Tarek, are you Egyptian? Did you know that Egyptians would inter-breed?"—a revolting comment that reduced Dr. El-Ghazaly's identity to a racist trope.

29. Unfortunately, this was not an isolated remark. Over the following six months, Dr. Fitzgerald made his bias known by repeatedly spewing racist and xenophobic remarks, targeting Dr. El-Ghazaly and other minorities with open contempt. On October 6th, 2023, while performing a urethral dilation, Dr. Fitzgerald told Dr. El-Ghazaly, "In Egypt, they don't use numbing gel. They believe the patient should be punished for having a problem."

### *Installing an Unqualified Ally: Dr. Fierro*

30. Early in his tenure, Dr. El-Ghazaly witnessed Dr. Fitzgerald provide substandard care to his patients. Among other things, Plaintiff observed Dr. Fitzgerald struggling while performing robotic prostatectomies, which had the potential to cause severe morbidity to patients

5

with long term loss of urinary incontinence, as well as unnecessarily prolonging the surgery and raising the risk of cardiovascular compromise. Plaintiff also observed Defendant Fitzgerald failing to dissect and ligate the vas deferens on both sides for a Haitian-American patient undergoing a vasectomy, a basic urological procedure. Dr. El-Ghazaly later heard Dr. Fitzgerald make disparaging remarks about Haitian-American patients undergoing certain urological treatment interventions.

31.     Dr. El-Ghazaly, new to his role, initially refrained from voicing his concerns and simply tried to assist Dr. Fitzgerald to the best of his capability.

32.     Very quickly, despite Dr. Fitzgerald's personal bias towards Dr. El-Ghazaly, he could not deny Dr. El-Ghazaly's professional experience and capabilities.

33.     Consequently, in or around March 2023, Dr. Fitzgerald directed Dr. El-Ghazaly to train under the supervision of Allegra Fierro, M.D. ("Dr. Fierro").

34.     Dr. Fitzgerald had strongly advocated the hiring of Dr. Fierro as an attending to supervise urology residents, despite the fact she had no training in urology.

35.     Despite her glaring lack of credentials, Dr. Fitzgerald permitted Dr. Fierro to falsely present to colleagues and trusting patients as a urology attending––although she had in fact only been hired as a hospitalist—which provided her the unearned authority to supervise residents, sign patient notes, and undertake procedures for which she had absolutely no training.

36.     Dr. Fierro also scheduled surgical cases for Dr. Fitzgerald, without the clinical knowledge to select appropriate procedures, placing unsuspecting patients at extreme risk.

Case 2:25-cv-08999-BMC   Document 2-1   Filed 09/12/25   Page 7 of 35 PageID #: 199

*__Plaintiff Risks His Promising Career to Protect Lives__*

37.     In the first few months of his residency, the incompetencies Dr. El-Ghazaly witnessed between Dr. Fitzgerald and his protégé Dr. Fierro, and their resistance to constructive feedback, became a growing concern.

38.     By way of example, after a bungled prostatectomy, Dr. Fitzgerald sought feedback from Dr. El-Ghazaly and asked for his thoughts via text. Dr. El-Ghazaly, in response, provided respectful, constructive clinical observations detailed in Exhibit A. The next day, Dr. Fitzgerald berated him, declaring that his age and experience were a "problem" and warning him that he needed to "know his place."

39.     Dr. El-Ghazaly verbally voiced his concerns regarding Dr. Fitzgerald's highly flawed technique using robotic prostatectomies to PGY5 chief residents Dr. Tal Cohen ("Dr. Cohen"), who told him to "remain silent" and Dr. Annie Chen ("Dr. Chen"), who told him "Tarek this is not the program where you express your concerns."

40.     Although terrified of the impact speaking out would have on his medical career, the malpractice Dr. El-Ghazaly witnessed soon became too concerning to just remain silent.

41.     In April 2023, one of Fitzgerald's patients suffered a postoperative myocardial infarction. Dr. Fitzgerald placed Dr. Fierro in charge of the patient's post-operative care. Dr. Fierro's negligently failed to prescribe essential blood pressure medication, which caused the patient's systolic blood pressure to escalate to a dangerous level of 200mmHg, which worsened the patient's myocardial infarction postoperatively.

42.     Dr. El-Ghazaly witnessed Dr. Fierro's undeniable malpractice.

43.     Worse, Dr. El-Ghazaly witnessed multiple other instances of Dr. Fierro's rank incompetence harming patients, including but not limited to: (i) scheduling an inappropriate and

unnecessary procedure for a patient deemed too sick by a tumor board to even undergo chemotherapy, much less surgery; (ii) failing to identify signs of an impending septic shock in another patient; and (iii) independently performing a procedure on a patient without the requisite training, which led to multiple re-admissions by the patient which could have been entirely avoided.

44.     Unable to idly stand by and watch the danger Dr. Fierro imposed upon trusting patients, and bound by his Hippocratic oath to "Do No Harm," Dr. El-Ghazaly reported Dr. Fierro's incidents of malpractice to his chief residents. To ensure that immediate corrective action would be taken to protect unsuspecting patients from Dr. Fierro's dangerous incompetence, he submitted a letter on March 22, 2023, "Litigation Risk to VA Residents," outlining egregious patterns of medical misconduct by Dr. Fierro. See Exhibit B.

45.     Dr. El-Ghazaly's complaints were further corroborated when the internal medicine department complained about Dr. Fierro's management of a patient. And like clockwork, Dr. Fitzgerald came to her defense, shamelessly maintaining the lie that she was a qualified urology attending, and as such, she "needs to be obeyed."

46.     By August of 2023. Dr. Fierro's track record of incompetence was too well documented, largely due to Dr. El-Ghazaly courageously speaking out and submitting written complaints, so that even Dr. Fitzgerald could no longer protect her.

47.     In August of 2023. Dr. Fierro resigned.

### *Dr. Fitzgerald Retaliates by Physically Assaulting Dr. El-Ghazaly in the Operating Room*

48.     Shortly after Dr. Fierro's resignation, Dr. Fitzgerald engaged in shocking behavior that revealed his extreme animus towards Plaintiff after he had exposed Dr. Fierro's incompetence and forced her exit from SBUH.

8

49.     Dr. Fitzgerald informed Dr. El-Ghazaly that he knew he had a meeting with Dr. Kim following the complaint about Dr. Fierro. He then threatened: "You understand that whatever I tell Jason at the end of your rotation will determine your future..."

50.     Dr. Fitzgerald also stated, "I think your age and experience have been a problem." "You should be demoted."

51.     Thereafter, Dr. Fitzgerald would repeat his offensive comments about Egyptians as "inbreds." He also made derogatory comments about African-Americans and Haitian-Americans saying they "wouldn't respond to interventions" because they were "predisposed to prostate cancer," and he mocked Jews during clinic hours, showing videos ridiculing a Jewish man in a video flinging a chicken over his head in connection with Yom Kippur while quipping, "Do you ever see yourself doing anything like that?"

52.     On September 29, 2023, while Dr. Fitzgerald and Dr. El-Ghazaly were in the operating room performing a hydrocelectomy, Dr. Fitzgerald physically assaulted Dr. El-Ghazaly.

53.     During the end of a scrotal hydrocelectomy, which involves making a small incision in the patient's scrotum, Dr. El-Ghazaly was suturing the edges of the hydrocele sac, when Dr. Fitzgerald told him he wasn't holding the needle holder the way he wanted it held. Dr. Fitzgerald then used the sharp-toothed, bloodied Adson Forceps that the two doctors had been using throughout the surgery to grab Dr. El-Ghazaly's finger, pinching it hard multiple times, while twisting, cutting through Dr. El-Ghazaly's gloves.

54.     Shockingly, as Dr. El-Ghazaly cried out in pain, Dr. Fitzgerald admitted he did it intentionally, to "teach him a lesson," smugly bragging to the medical student witness that another attending had been fired for the same behavior. Then Dr. Fitzgerald, sadistically and recklessly,

9

repeated the attack several more times, which foreseeably penetrated Dr. El-Ghazaly's gloves resulting in bruising to his finger.

55. Dr. Fitzgerald's retaliatory assault created a risk to the patient by continuing to use a contaminated instrument during surgery, as well as to Dr. El-Ghazaly since the patient had not been tested for HIV or Hepatitis prior to the surgery.

56. Joanne Kim, a medical student, witnessed this assault in real time and corroborated Dr. El-Ghazaly's report. See Exhibit C.

***The Hospital Ignores Dr. Fitzgerald's Pattern of Medical Incompetence, as well as his Discriminatory and Retaliatory Conduct.***

57. Immediately following the assault, during the very next surgery, Dr. Fitzgerald told Dr. El-Ghazaly, "Arabs don't shower," and "we should have bombed them after 9/11."

58. These horrific, dehumanizing remarks were made in the middle of a surgical procedure—degrading, racist, and utterly unprofessional.

59. Dr. El-Ghazaly reported both the physical assault and hate speech to the Stony Brook Office of Equity ("Equity Office").

60. After a thorough investigation, the Equity Office fully substantiated his complaint. See Exhibit D.

61. Despite the findings of the Equity Office, the Hospital took no meaningful corrective action against Dr. Fitzgerald.

62. Dr. El-Ghazaly also reported his concerns regarding Dr. Fitzgerald's manifest incompetence in the operating room. For example, Dr. Fitzgerald struggled while performing robotic prostatectomies, which had the potential to cause severe morbidity to patients with long-term loss of urinary continence, as well as to prolong the surgery and raise the risks of

10

cardiovascular compromise. Dr. El-Ghazaly also reported during another procedure Dr. Fitzgerald's failure to dissect the vas deferens on both sides for a patient undergoing a vasectomy.

63.     Much like his report of discrimination, the Hospital took no action whatsoever against Dr. Fitzgerald. The Hospital's culture of protecting their own overrode the blatant risk of danger Dr. Fitzgerald posed to patients.

64.     The environment Dr. Fitzgerald created in the operating room emboldened others to join in on the discriminatory verbal abuse. For example, after the same case during which Dr. Fitzgerald made the latter comments, the attending Anesthesiologist, Dr. Caballero, asked Dr. El-Ghazaly in the Post Anesthesia Care Unit, "so did you train with Dr. Ayman Al-Zawahri (Bin Laden's number two)? You know he was a doctor, right?" Dr. Caballero then burst into laughter.

65.     Other residents who had previously been mistreated by Dr. Fitzgerald continued to face abuse from physicians within his circle, further contributing to a hostile work environment for trainees.

66.     Moreover, Dr. Fitzgerald continued to mismanage minority patients even after the complaint. For example, on February 9, 2024, a Jewish patient presented to the emergency room with a documented intra-peritoneal bladder rupture resulting from a negligent procedure performed by Dr. Fitzgerald. Despite clear medical guidelines, which necessitated immediate surgical intervention to repair the damage, Dr. Fitzgerald inappropriately discharged the patient home, leading to a worsening condition that progressed into full-blown peritonitis and ileus. The patient was later readmitted and required multiple additional procedures and a prolonged hospitalization as a result of Dr. Fitzgerald's mismanagement.

11

### *Dr. Kim Enables Dr. Fitzgerald's Grossly Improper Conduct*

67.     On October 27, 2023, Dr. El-Ghazaly assisted Dr. Tal Cohen with a six-hour radical cystectomy and ileal conduit surgery. After the surgery, Dr. Cohen gave Dr. El-Ghazaly purely positive feedback, told him he did a great job, and told him that he delivered the same feedback to Dr. Kim. Dr. Cohen noted the way Dr. Fitzgerald was treating Dr. El-Ghazaly and asked Dr. El-Ghazaly, "Why is he being such an asshole to you?"

68.     Dr. El-Ghazaly reported Defendant Fitzgerald's bigoted statements to Dr. Kim, the Program Director, in writing, on October 29, 2023, and provided Joanne Kim's contact information so that Dr. Kim could confirm that the assault and battery had occurred. Dr. El-Ghazaly's assault and battery complaint.

69.     Dr. Kim, visibly irritated, responded by telling Dr. El-Ghazaly that he was "forced" to forward his complaint for further investigation because it was sent in writing.

70.     To be sure that Dr. El-Ghazaly got the message that Dr. Kim had every intention of ignoring his "complaint," on the weekend of December 8-9, 2023, Dr. Kim scheduled Dr. El-Ghazaly to be on call with Dr. Fitzgerald—deliberately putting him back under the control of the same doctor who had assaulted and harassed him, despite Dr. El-Ghazaly having expressed relief at being away from Dr. Fitzgerald during a two-month external rotation

71.     Dr. Fitzgerald then immediately manufactured a false allegation during that call, claiming Dr. El-Ghazaly missed an emergency case.

72.     Dr. Fitzgerald falsely accused Dr. El-Ghazaly of "missing an acute abdomen" in a patient who presented to emergency with poor urinary output. Acute abdomen is a surgical diagnosis that emergency attendings are trained to detect and consult for general surgery.

12

73.     In this case, the attending did not feel the need to call general surgery for the patient upon his presentation with poor urinary output.

74.     Despite the attending's failure to respond, Dr. El-Ghazaly—who was on home call—arrived at the patient's bedside within 30 minutes. His swift and decisive actions, including personally wheeling the patient to the CT scanner to expedite diagnosis, were praised by senior urology resident Dr. Lu and the emergency resident Dr. Maguire.

75.     Because of the completely false narrative that Dr. Fitzgerald was attempting to create about him, Dr. El-Ghazaly sent Dr. Kim an email the following day expressing his concerns, emphasizing that Dr. Fitzgerald was intentionally trying to cause him professional harm.

76.     Tellingly, upon learning of the events, Dr. Kim privately admitted to Dr. Lu during a phone call: "Tarek did a good job." He also privately told Dr. Lu, "It doesn't sound like Tarek to delay. I bet he drove right in once they called him." See Exhibit E.

77.     Dr. Kim's sole focus was on retaliating against Dr. El-Ghazaly. On December 11, 2023, he called Dr. El-Ghazaly and warned him never to send another written complaint, saying, "He is the attending and you are the resident. You are never going to win this."

78.     Dr. Kim took no corrective action whatsoever against Dr. Fitzgerald for making a false accusation against Dr. El-Ghazaly, but rather, he used the false allegation to submit a written warning in February 2024 to Dr. El-Ghazaly that he later used as pretext for his termination.

*Undeniable Clinical Excellence and Growing Retaliation*

79.     Following his complaint against Dr. Fitzgerald, during November and December 2023, Dr. El-Ghazaly completed a two-month external rotation at Good Samaritan Hospital.

13

80.     He received unanimous "Exceeds Expectations" marks from the chairman of the rotation, who had solicited feedback from all six Dr. El-Ghazaly had worked with during the rotation. See Exhibit F.

81.     Chair Dr. Loizdes praised him as professional, diligent, and highly competent. Dr. Kukadia a private attending at the Good Samaritan rotation also had positive things to say about Dr. El-Ghazaly's performance and professionalism, writing: "I was always impressed that he arrived to each case well prepared. He knew everything about the patient, summarizing the details, imaging reports, etc. He took over the care from start to finish, rarely did I have to intervene. He was eager to see patient consults and assist with problems on the floor. I had complete confidence that my private patients were in good hands. Furthermore he communicated well with nursing staff and fellow physicians. He was personable, good natured and professional. I enjoyed good rapport with him and even invited him to come back on Fridays to do my cases after his rotation ended. I had absolutely no misgivings about his character or competence."  See Exhibit F.

### *Cover-Ups and Institutional Gaslighting*

82.     Yet despite the repeated praise Dr. El-Ghazaly received, in early January 2024, Dr. Kim told senior residents to prepare to have Dr. El-Ghazaly repeat his PGY3 year and encouraged them to gather negative evidence against him to justify this decision. At this point, Dr. El-Ghazaly was just two months into his PGY-3 year, during which he received "Exceeds Expectations" evaluations across the boards for his performance as a PGY3.

83.     On January 12, Dr. El-Ghazaly promptly responded to a 4:12 a.m. page concerning Dr. Waltzer's patient. Dr. Waltzer and Dr. Huang later falsely accused him of ignoring it for hours.

14

84.     Dr. Huang contacted Dr. El-Ghazaly in the morning and told him that Dr. Waltzer had been falsely informed by a resident that Dr. El-Ghazaly was paged for the patient at midnight and refused to see the patient, then waited four hours before seeing him.

85.     Dr. El-Ghazaly responded by showing Dr. Huang the timing of his page and the timing of his note, which proved he had received the page shortly after 4:00am. See Exhibit G.

86.     Despite this Dr. Huang told Dr. El-Ghazaly not to tell Dr. Waltzer what really happened, and admitted that she didn't tell the leadership the truth about the incident. See Exhibit G.

### *Defendant Kim's Bias is Made Explicit*

87.     On January 13, 2024, Dr. El-Ghazaly emailed Dr. Kim expressing concerns that the general surgery chief resident was spreading fabricated information about him directly to the chairman and explained the situation to him. See Exhibit H.

88.     Dr. Kim responded on January 14, 2024, by texting Dr. El-Ghazaly requesting a meeting to discuss his progress.

89.     During the meeting Dr. Kim acknowledged that Good Samaritan "loved" Dr. El-Ghazaly.

90.     Nonetheless, Dr. Kim said he is highly likely to repeat the PGY3 year based on his performance.

91.     Dr. Kim admitted other residents had performed much worse on the in-service exam and were not punished.

92.     Dr. Kim then exposed his discriminatory mindset, telling El-Ghazaly there was a "cultural thing" about how he speaks.

15

93. After the meeting, Dr. Huang told Dr. El-Ghazaly that if he had not sent Dr. Kim another complaint, Dr. Kim would not have arranged the meeting.

*__Weaponized Discipline to Silence a Whistleblower__*

94. On February 12, 2024, Dr. Kim delivered a Letter of Warning to Dr. El-Ghazaly. Exhibit I.

95. Shockingly, one of the primary written justifications for the issuance of the Letter of Warning was El-Ghazaly's written complaints.

96. It included numerous falsehoods and misleading quotes—contradicted by medical charts, corroborating statements, and real-time praise from attendings.

97. For example, it falsely accused him of abandoning a surgical patient who was not even under urology's care.

98. It also cited an anesthesiologist's vague comment about "resistance" despite El-Ghazaly's strict adherence to protocol as detailed later by his senior resident, who approved all his orders beforehand, then admitted she 'got into trouble' with Dr. Kim when she defended Dr. El-Ghazaly, revealing his coercion of residents to submit complaints against Dr. El-Ghazaly. See Exhibit J.

99. In addition to citing Dr. El-Ghazaly's submission of written complaints as a reason for its issuance, Dr. Kim's Letter of Warning came with a verbal warning to never send any more written complaints, and threats to Dr. El-Ghazaly that "these complaints will sink you, and will be your downfall in this program."

16

*Universal Praise from Surgeons and Attendings*

100.    The Letter of Warning also indicated a need for daily briefings by Dr. El-Ghazaly's attending physicians after surgical procedures. This ultimately backfired because his evaluations were uniformly positive.

101.    Between February and April 2024, numerous attending physicians—including Drs. Davis, Schulsinger, Weissbart, Berg, Sheynkin, Spaliviero, Churukanti, and Darras—offered written and verbal praise to Dr. El-Ghazaly for excellent performance, professionalism, and surgical skill. See Exhibit K.

102.    Even Dr. Kim acknowledged his surgical preparedness—then again dismissed his success as a "cultural issue." See Exhibit L (excerpts of this recording).

103.    On February 25, 2024, Dr. Lu, the PGY4 resident who had just finished being on a thirty-six-hour call with Dr. El-Ghazaly, called to tell him that he did a great job as the junior resident on call and that it would be a shame to have to repeat the year after the great job he's done. She told Dr. El-Ghazaly about Dr. Kim's meeting with the senior residents. She told him that a PGY3 spot had opened up in Boston, at Harvard Beth Israel Deaconess Medical Center ("Harvard-BIDMC") and urged him to apply for the position and transfer there to escape Dr. Kim's retaliation.

104.    Dr. El-Ghazaly applied for the position and was invited for multiple interviews supported by positive feedback relayed by the assistant program director, Dr. William Berg, as well as written assurances by the Chair, Dr. Waltzer, to support his application for the PGY3 spot at Harvard-BIDMC. They ultimately chose an applicant from a more prestigious institution for the position.

17

_**Negligence and Favoritism Run Rampant**_

105.    While Dr. El-Ghazaly faced punishment for speaking up, favored residents under Dr. Kim's protection committed horrific errors: allowing cancer to spread, lying about care, and causing preventable deaths.

106.    By way of example, in or around February 2024, Dr. El-Ghazaly had noticed Chief Resident Dr. Huang's poor preparation for partial nephrectomy procedures, and texted her images and a summary of a patient's abnormal anatomy leading to a triple blood supply to the right kidney that would need to be addressed during the scheduled procedure to avoid catastrophic complications. Dr. Huang, and later, Dr. Waltzer, ignored Dr. El-Ghazaly's warning before and during the procedure, leading to the tumor being very well-perfused during the dissection, leading to the cystic component of the tumor rupturing all over the patient's abdomen as they carried out resection amid profuse bleeding that obscured the safe resection margin. Such a complication is associated with a 10-fold higher recurrence of cancer after surgery. See Exhibit M.

107.    Dr. El-Ghazaly reported this incident of negligence to Dr. Waltzer in an email on March 29, 2024. Dr. Huang did not face any disciplinary action for the catastrophic complications suffered by the patient, despite being warned of the abnormal anatomy beforehand. Instead, Dr. El-Ghazaly was later penalized for making his report, as evidenced by the fact that his criticism was cited in the termination letter.

108.    In another example of favoritism impacting patient care at this program, Dr. Huang recalled to Dr. El-Ghazaly how she mistakenly performed the wrong bedside procedure for the wrong patient without verifying his identity, and without confirming the procedure with her senior physicians, leading to multiple complications for the patient, who had to undergo invasive procedures and prolonged hospitalization as a result of these mistakes. Dr. Huang did not face any

18

consequences by Dr. Kim for such negligent malpractice. Dr. El-Ghazaly reported this incident to the SBUH Graduate Medical Education office on April 8, 2024.

109. On March 8, 2024, Dr. El-Ghazaly was assigned to assist the Chief Resident, Dr. Chris Du, and Dr. Waltzer with a laparoscopic radical nephrectomy. After the ports were placed, Dr. Waltzer left the room to provide the Chief Resident with an opportunity to start the dissection on his own. Dr. El-Ghazaly was tasked with holding the camera for the Chief Resident.

110. While the Chief Resident was taking the bowel down over the upper pole of the kidney, Dr. El-Ghazaly noticed the spleen was very closely and tightly tethered to the upper pole of the kidney, placing it at risk of splenic hilar avulsion with aggressive manipulation of the kidney, especially during a hand-assisted procedure. Dr. El-Ghazaly advised the Chief Resident to release the closely tethered spleen to avoid injury to the splenic hilum while the kidney is being pulled on. The Chief Resident declined Dr. El-Ghazaly's advice, saying he would rather make some progress on the kidney and hilar dissection before Dr. Waltzer returned to the room.

111. Dr. El-Ghazaly had warned his seniors multiple times in the past about the abandonment of safe techniques during the laparoscopic and robotic dissection of the renal hilum by Dr. Waltzer. The patient ended up dying from uncontrolled bleeding due to a suspected splenic hilar injury, and the general surgery team was called in too late to perform the splenectomy. The patient received at least 19 units of blood before succumbing to the injuries she sustained during Dr. Waltzer's procedure.

112. Concerned with the recurrence of these catastrophic complications at SBUH, Dr. El-Ghazaly communicated his concerns about poor preparation before renal surgery, as well as the abandonment of safe technique during renal procedures in an email to the chairman, Dr. Waltzer, on March 29, 2024, and detailed techniques he had learned during his advanced laparoscopic and

19

robotic fellowship training at Northwestern, where no such complications routinely witnessed at SBUH had occurred. See Exhibit N.

113.    Despite this tragic and preventable death of a patient, neither Dr. Waltzer, nor any of Dr. Kim's favored residents faced any disciplinary action.

### *Defendants' Personal Acts and Dates*

**Dr. Kim**:

114.    October 29, 2023: Kim breached confidentiality by informing Fitzgerald of Dr. El-Ghazaly's disciplinary meeting outcome.

115.    November 2023: Kim threatened non-promotion to PGY4 despite El-Ghazaly receiving "Exceeds Expectations for PGY level" on every evaluation question.

116.    December 8-9, 2023: Kim deliberately scheduled El-Ghazaly to work call with Fitzgerald after the assault complaint.

117.    December 11, 2023: Kim warned El-Ghazaly "never to send another written complaint" and "you are never going to win this".

118.    February 12, 2024: Kim issued warning letter citing El-Ghazaly's written complaints as justification.

119.    March 15, 2024: Kim falsely told El-Ghazaly that Office of Equity findings were "unsubstantiated" when he knew they were substantiated.

120.    March 2024: Kim submitted fabricated negative evaluations for procedures he supervised himself.

121.    March-April 2024: Kim directed Dempsey to submit false email credentials blocking El-Ghazaly's ACGME survey access.

20

122.    April 17, 2024: Kim terminated El-Ghazaly citing false allegations and criticizing him for reporting safety concerns.

**Dr. Waltzer**:

123.    Dr. Waltzer received a detailed email in March 2023 detailing the results of the discrimination investigation.

124.    As Department Chair, Waltzer had ultimate responsibility for resident safety and work assignments, yet despite explicit knowledge of the substantiated discrimination and assault claims, he failed to take protective action and allowed continued exposure to the perpetrator.

125.    More specifically, Waltzer possessed clear authority to shield Plaintiff from John Fitzgerald by not putting him on call with the man who assaulted him, yet deliberately chose not to exercise that protective authority.

126.    July 18, 2023: Waltzer experienced tumor rupture during surgery with no disciplinary consequences.

127.    August 16, 2023: Waltzer's procedure required conversion to open due to complications with no disciplinary consequences.

128.    August 18, 2023: Waltzer had additional surgical complications with no disciplinary consequences.

129.    March 8, 2024: Waltzer was involved in patient death during laparoscopic radical nephrectomy due to splenic hilar injury with no disciplinary consequences.

**Dr. Fitzgerald's Discriminatory Acts**:

130.    March 2023: Fitzgerald called Egyptians "inbreds" and made other racist remarks.

131.    September 29, 2023: Fitzgerald physically assaulted El-Ghazaly with bloodied surgical instruments, witnessed by medical student Joanne Kim.

21

132.    October 6, 2023: Fitzgerald stated "Arabs don't shower" and "we should have bombed them after 9/11".

133.    February 9, 2024: Fitzgerald mismanaged Jewish patient with intra-peritoneal bladder rupture.

**Dr. Huang's Actions and Comparative Treatment**:

134.    January 12, 2024: Huang made false accusations about El-Ghazaly ignoring 4:12 AM page for hours, then refused to correct the record when shown proof.

135.    February 2024: Huang ignored El-Ghazaly's warning about patient's triple blood supply, leading to tumor rupture with no disciplinary consequences.

136.    During Plaintiff's employment by Defendants, Huang performed wrong-patient procedure without identity verification, causing complications requiring invasive corrective procedures, with no disciplinary consequences.

137.    As chief resident, Dr. Huang possessed scheduling authority and could have prevented Plaintiff from being placed on call with Dr. Fitzgerald yet deliberately failed to exercise this protective authority.

**Ms. Dempsey's Actions and ACGME Obstruction**:

138.    Ms. Dempsey's position provided her with authority over critical procedural mechanisms and external reporting channels. Although she had personally witnessed discriminatory statements made toward Plaintiff by Jason Kim, she chose to use her authority to systematically obstruct El-Ghazaly's ability to seek redress through proper channels.

139.    Ms. Dempsey's role extended beyond administrative coordination to active obstruction of protected reporting. In March/April 2024, Dempsey submitted false email credentials to ACGME to block El-Ghazaly's survey access at Kim's direction.

### *Retaliatory Erasure and Termination*

140.    On or around March 15, 2024, Dr. Kim called Dr. El-Ghazaly, telling him, falsely, that his allegations against Dr. Fitzgerald were investigated and found to be unsubstantiated and wondering if he had been lying about what happened.

141.    Unbeknownst to Dr. Kim, Dr. El-Ghazaly had already directly received a letter from the Office of Equity informing him of the true result of the investigation: that the allegations were all found to be substantiated. (Ex. D). Dr. Kim ended the phone call by reiterating his intention to arrest Dr. El-Ghazaly's PGY progress allegedly based on his performance. Excerpts of a recording of this conversation is attached as Exhibit O.

142.    In or around March 2024, Dr. Kim posted a series of fake negative evaluations for Dr. El-Ghazaly for procedures he done with him, that he had also previously done with Dr. Steven Weissbart, who had no concerns and was very happy with Dr. El-Ghazaly's performance during the same procedures.

143.    Throughout March and April, 2024, Dr. Kim temporarily blocked Dr. El-Ghazaly from completing the ACGME survey by having his office led by Ms. Dempsey submit false email credentials to the ACGME. See Exhibit P.

144.    On March 16, 2024, Dr. El-Ghazaly sent an email to Dr. Waltzer, communicating his concerns about retaliatory actions and fabrications by Dr. Kim, a breach of confidentiality by Dr. Kim regarding a trainee's medical condition, as well as detailing surgical negligence by Dr. Michael Ernst that had led to the loss of a child's kidney. See Exhibit Q.

145.    Facing inaction by the chairman, on April 8th, 2024, Dr. El-Ghazaly sent an email to the graduate medical education office with concerns about a dangerous situation at SBUH, retaliatory action and affinity bias by Dr. Jason Kim, the program director at the time, and detailing

23

how Dr. Kim knowingly allowed for an unqualified Dr. Fierro to independently supervise residents despite her lack of urology training. See Exhibit R.

146.     On April 17, 2024, based on Defendants' knowingly false, misleading and dishonest claims, Dr. El-Ghazaly was fired. See Exhibit S.

### *Publication to Third Parties and Ongoing Foreclosure ("Stigma-Plus")*

147.     Constructive Publication Through Accessible Records: By placing materially false and stigmatizing statements in Plaintiff's personnel, training, and evaluation records, files routinely accessed by prospective employers, credentialing bodies, and licensing authorities, Defendants effectively published these statements to third parties. Defendants knew that such records would be disclosed as a matter of course during employment verification, hospital credentialing, and medical licensing processes, in effect making their placement of false information a direct publication to the medical community at large.

148.     April 4, 2025: The University of Virginia ("UVA") publicly identified Plaintiff as its incoming fellow, featuring his photo in interviews and announcing "Tarek is the new fellow." Between April 4-22, 2025: On information and belief, Dr. Kim (and/or those acting with him) communicated stigmatizing statements regarding Plaintiff's professional competence, ethics, and fitness to practice to UVA's Risk Assessment/Credentialing personnel via phone and credentialing portal/email.

149.     April 22, 2025: UVA rescinded the fellowship offer citing "board ineligibility."

150.     April 24, 2025: UVA changed the rationale to lack of transparency during the interview process, reflecting reliance on Defendants' stigmatizing publications.

24

151.    On information and belief, SBU staff communicated stigmatizing charges to UVA's credentialing/risk offices by email/portal and by phone, which UVA relied upon in rescinding the offer.

152.    Ongoing Publication: Defendants have published adverse program verifications and references concerning Plaintiff to:

a.  Virginia Board of Medicine

b.  Hospital medical staff offices conducting reference checks

c.  Background check companies and credentialing bodies

153.    Concrete Consequences: As a result of these publications, Plaintiff has been effectively blacklisted from medical programs throughout the United States, has encountered credentialing holds and rejections, and has been rendered essentially unemployable in academic urology.

### *A Doctor Who Spoke the Truth—and Paid the Price*

154.    Dr. El-Ghazaly exemplified what the medical profession claims to value: courage, integrity, patient advocacy, and the moral backbone to speak up when others stayed silent.

155.    For daring to report racist hate speech, incompetence, and abuse, Dr. El-Ghazaly was isolated, retaliated against, and ultimately terminated.

## CAUSE OF ACTION

*Count I — 42 U.S.C. § 1983 (Equal Protection and Rights Secured by 42 U.S.C. § 1981 via § 1983)*
**Against Kim, Waltzer, Fitzgerald, Dempsey, and Huang (individual capacities)**

156.    Plaintiff realleges and incorporates each and every allegation set forth above and below as if fully set forth and restated herein.

25

157.    Drs. Kim and Fitzgerald harassed and discriminated against Dr. El-Ghazaly with respect to his compensation, terms, conditions, or privileges of employment, because of Dr. El-Ghazaly's race and/or national origin.

158.    More specifically, by way of illustration, Dr. Kim subjected Dr. El-Ghazaly to a pattern of harassment including, but not limited to, allowing his supervisor, Dr. Fitzgerald, to subject Dr. El-Ghazaly to harassing comments, including calling him inbred on multiple occasions, dehumanizing comments about Egyptian physicians, and referring to a group related to him as a people who "don't shower" and "should have been bombed", as well as assigning Dr. El-Ghazaly to work with Dr. Fitzgerald after the latter had assaulted him in the operating room.

159.    Dr. El-Ghazaly was further subjected to adverse actions, including but not limited to, a harassing and hostile work environment, unwarranted reprimands, and the termination of his employment, in a discriminatory manner because of his race and/or national origin.

160.    Defendants acted with malice and/or with reckless indifference to Dr. El-Ghazaly's federally protected rights.

161.    As a direct and proximate result of these violations by Defendants, Dr. El-Ghazaly has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

162.    Plaintiff asserts violations of rights secured by 42 U.S.C. § 1981 through 42 U.S.C. § 1983. Defendants' conduct was because of Plaintiff's race and ancestry and, but for that racial animus, the adverse actions—including discipline and termination—would not have occurred.

163.    Dr. El-Ghazaly seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay),

26

diminished earning capacity, injury to reputation, loss of surgical skill, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

*Count II — 42 U.S.C. § 1983 (Retaliation for Enforcing § 1981 Rights)*
**Against Kim, Waltzer, Fitzgerald, Dempsey, and Huang (individual capacities)**

164.    Plaintiff realleges and incorporates each and every allegation set forth above and below as if fully set forth and restated herein.

165.    Plaintiff engaged in protected activity under Section 1981, including, but not limited to, expressing concerns regarding, and otherwise opposing, the harassment and discrimination he was subjected to based on his race and national origin, and reporting discrimination/assault/safety issues. Defendants retaliated by scheduling him with his assailant, issuing a warning that cited his complaints, fabricating evaluations, interfering with ACGME survey access, and terminating his employment.

166.    The Defendants unlawfully coerced, intimidated, threatened, and/or interfered with Dr. El-Ghazaly's exercise of or enjoyment of rights granted by Section 1981.

167.    More specifically, the Defendants discriminated and/or retaliated against Dr. El-Ghazaly for engaging in activity protected under Section 1981, including, but not limited to, by allowing employees, including his supervisor Dr. Fitzgerald, to subject Dr. El-Ghazaly to harassing comments, including calling him an inbred on multiple occasions, and dehumanizing comments about Egyptian physicians and Arabs.

27

168.    Dr. El-Ghazaly was further subjected to adverse action, including, but not limited to, a hostile work environment, unwarranted reprimands, and the termination of his employment, in a retaliatory manner for engaging in protected activity under Section 1981.

169.    The Defendants acted with malice and/or with reckless indifference to the federally protected rights of Dr. El-Ghazaly.

170.    As a direct and proximate result of the Defendants' violations of Section 1981, Dr. El-Ghazaly has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

171.    Plaintiff engaged in protected activity under § 1981 by opposing race/ancestry-based harassment and assault; Defendants knew of this opposition and retaliated by escalating discipline and terminating him. But for his protected opposition, Defendants would not have taken these actions.

172.    Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, loss of surgical skill, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

*Count III – Retaliation for Engaging in Protected Activity in Violation of New York State Human Rights Law, Executive Article 15, Section 296*
**Against Kim, Waltzer, Fitzgerald, Dempsey, and Huang (individual capacities)**

173.    Plaintiff realleges and incorporates each and every allegation set forth above and below as if fully set forth and restated herein.

28

174.    Dr. El-Ghazaly engaged in protected activities under the NYSHRL including, but not limited to, by expressing concerns regarding, and otherwise opposing, the harassment and discrimination he was subjected to based on his race and national origin.

175.    Defendants unlawfully coerced, intimidated, threatened, and/or interfered with Dr. El-Ghazaly's exercising of or enjoyment of rights granted by the NYSHRL.

176.    More specifically, the Defendants discriminated and/or retaliated against Dr. El-Ghazaly for engaging in activity protected under the NYSHRL, including but not limited to, by allowing employees, including his supervisor Dr. Fitzgerald, to subject Dr. El-Ghazaly to harassing comments, including calling him inbred on multiple occasions, and dehumanizing comments about Egyptian physicians and Arabs.

177.    Dr. El-Ghazaly was further subjected to adverse actions, including, but not limited to, a hostile work environment, unwarranted reprimands, and the termination of his employment, in a retaliatory manner for engaging in protected activity under the NYSHRL.

178.    The Defendants' actions were wanton, malicious, and/or oppressive.

179.    The Defendants acted willfully and/or with reckless disregard for the protected rights of Dr. El-Ghazaly.

180.    As a direct and proximate result of the Defendants' violation of the NYSHRL, Dr. El-Ghazaly has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

181.    Dr. El-Ghazaly seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, loss of surgical skill, other monetary damages,

29

compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, attorneys' fees, interest, and costs.

*Count IV — 42 U.S.C. § 1983 (Procedural Due Process — "Stigma-Plus")*
**Damages against individual Defendants**

182.    Plaintiff realleges and incorporates each and every allegation set forth above and below as if fully set forth and restated herein.

183.    Defendants published false, stigmatizing statements about Plaintiff to UVA Credentialing/Risk Assessment, hospital credentialing offices, and other third parties, which caused the rescission of an accepted fellowship, and ongoing foreclosure of opportunities.

184.    Upon information and belief, Defendants publicly disseminated stigmatizing charges about Plaintiff in connection with employment and credentialing verifications following his April 17, 2024 termination, including to the University of Virginia in April 2025 and to approximately twenty other entities to whom Plaintiff sent job applications. As set forth above, Plaintiff requested opportunities to see and correct the accusations and sought to clear his name, but Defendants failed to provide a meaningful name-clearing process.

185.    As detailed above, Defendants made materially false, misleading and dishonest statements about Plaintiff regarding his allegedly improper conduct and the grounds for his termination from the SBUH program.

186.    As a result of Defendants' false and misleading statements, Dr. El-Ghazaly has suffered severe, permanent, and irreparable damage to his reputation.

30

187. As a result of false and misleading statements made to third parties, Dr. El-Ghazaly has been effectively blacklisted from medical programs throughout the United States, and his career as a urologist has been permanently destroyed.

188. Dr. El-Ghazaly has been deprived of procedural due process and has not been afforded notice and an opportunity to be heard in a name-clearing hearing.

189. The damage to Dr. El-Ghazaly's career was in addition to, and temporarily proximate to, the stigma generated by Defendants' false and misleading accusations.

190. Defendants created and placed false, stigmatizing charges (e.g., that Plaintiff was unsafe, dishonest, and unprofessional) in personnel/credentialing files that are routinely disclosed to credentialing entities and prospective employers, and did disseminate those charges in connection with credentialing requests concerning Plaintiff's UVA appointment, which was rescinded after SBU's communications. Plaintiff requested name-clearing, but Defendants refused.

191. As a result of Defendants' defamatory statements to third parties, Dr. El-Ghazaly was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, lost his Stony Brook University Hospital, and lost his livelihood as a medical doctor.

192. Dr. El-Ghazaly seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, loss of surgical skills, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

*Count V — NYSHRL (Executive Law § 296) — Discrimination*
**Against the individual defendants**

193.    Plaintiff realleges and incorporates each and every allegation set forth above and below as if fully set forth and restated herein.

194.    Defendants both individually and collectively harassed and discriminated against Dr. El-Ghazaly with respect to his compensation, terms, conditions, or privileges of employment because of Dr. El-Ghazaly's Egyptian race and national origin.

195.    More specifically, by way of illustration, Defendants subjected Dr. El-Ghazaly to a pattern of harassment including, but not limited to, allowing his supervisor, Dr. Fitzgerald, to subject Dr. El-Ghazaly to racially offensive comments, including calling him "inbred" on multiple occasions, and dehumanizing comments about Egyptian physicians and Arabs.

196.    Dr. El Ghazaly was further subjected to adverse actions, including but not limited to, a harassing and hostile work environment, unwarranted reprimands, and the termination of his employment, in a discriminatory manner because of his race and/or national origin.

197.    Defendants acted with malice and/or with reckless indifference to Dr. El-Ghazaly's state protected rights.

198.    As a direct and proximate result of Defendants' violations of the NYSHRL, Dr. El-Ghazaly has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

199.    Kim personally breached confidentiality, scheduled Plaintiff with his assailant, issued retaliatory warnings citing complaints, fabricated evaluations, blocked ACGME access, and terminated him. Fitzgerald personally assaulted Plaintiff and made racist remarks. Waltzer personally participated in disparate treatment by facing no discipline for patient

32

complications/death while Plaintiff was terminated. Huang personally made false allegations and faced no discipline for patient harm. Dempsey personally falsified ACGME credentials.

200.    SUNY/SBUH, through its Chair and Program Director, encouraged, condoned, and approved the discriminatory conduct; each individual defendant participated in the discrimination and retaliation and is liable under N.Y. Exec. Law § 296(6).

201.    Dr. El-Ghazaly seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, loss of surgical skill, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, attorneys' fees, interest, and costs.

**WHEREFORE**, Plaintiff, Tarek El-Ghazaly, M.D., respectfully asks this Court to enter preliminary and final orders and judgments as necessary to provide Plaintiff the following requested relief:

a.  Schedule this matter for trial by jury;

b.  Find the Defendants liable on all counts;

c.  Award the Plaintiff his lost compensation and benefits (including, but not limited to, back pay and front pay);

d.  Award the Plaintiff other monetary damages, including damages for his diminished earning capacity and injury to reputation, loss of surgical skills;

e.  Award the Plaintiff damages for his emotional pain, mental anguish, loss of enjoyment of life, suffering, and other emotional distress damages;

33

f.   Award the Plaintiff compensatory damages, including, but not limited to, future pecuniary

losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life,

and other nonpecuniary losses;

g.   Award the Plaintiff punitive damages;

h.   Award the Plaintiff his reasonable attorney's fees;

i.   Award the Plaintiff interest and costs;

j.   Award the Plaintiff all other damages to which he is entitled; and

k.   Grant such further relief as is just and equitable.


Dated: New York, New York
         September 12, 2025


Respectfully submitted,

**JOSEPH & NORINSBERG, LLC**

Daniel Needham, Esq.
Jon L. Norinsberg, Esq.
Bennitta L. Joseph, Esq.
*Attorneys for Plaintiff*
825 Third Ave., Suite 2100
New York, New York 10022
Tel. No.: (212) 227-5700
Fax No.: (212) 656-1889
jon@employeejustice.com
bennitta@employeejustice.com

34